Snow v. American Morgan Horse Assoc.  CV-93-463-JD  05/08/98
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Maxine W. Snow

v.                                    Civil No. 93-463-JD

The American Morgan Horse
Association, Inc., et al.


O R D E R


The plaintiff, Maxine W. Snow, brought this action alleging antitrust violations against the defendants, the American Morgan Horse Association, Inc. ("AMHA"), John L. Hammer, III, Tyler J. Atwood, Philip M. Dubois, Darwin A. Olson, Dr. Albert A. Lucine, Jr., George W. Arnold, Robert A. Epperson, James Stewart, Charles E. McPherson, Mary C. Woolverton, Marjorie D. Goodson, and Adrienne Wailes.[1]  Before the court are defendant Wailes' motion to dismiss (document no. 82), defendant Goodson's motion for summary judgment (document no. 72), and the remaining defendants' motion for summary judgement (document no. 73).[2]

_____

[1]An additional defendant, Carol Bailey Hudson, has been dismissed without prejudice to the plaintiff's claims against her.

[2]Defendant Goodson has merely incorporated the arguments of the AMHA in her motion for summary judgment, and so the court hereinafter refers collectively to the defendants as a unified group unless otherwise noted.

<u>Background</u>[3]

The plaintiff was involved in the Morgan horse business for over twenty years. During that time, she was a member of the AMHA. The AMHA is a nonprofit association that presents itself as dedicated to the preservation and promotion of the Morgan horse breed. In support of this end, the AMHA maintains a registry of purebred Morgan horses (the "Registry"). A horse can only be listed in the Registry if both its parents are registered Morgan horses.

This action stems from an investigation by the AMHA into the parentage of five horses registered by the plaintiff as Morgans but determined by the AMHA to be non-Morgans. The court relates <u>seriatim</u> the background of the investigation against the plaintiff, the state court litigation that resulted from the investigation, the history of this action, and the AMHA's treatment of other cases.

---

[3]The court relates all material facts in genuine dispute in the light most favorable to the plaintiff, the party resisting summary judgment. <u>See</u> <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 225 n.1 (1st Cir. 1996).

1. <u>Investigation of and Action Against the Plaintiff</u>[4]

In August or September 1991, the AMHA received a letter calling into question the lineage of five foals registered by the plaintiff as offspring of the Morgan mare Senora Showblez Vona ("Senora"). The letter questioned how a mare that was as old as Senora and who had not previously foaled could have five foals in five successive years. Defendant Atwood, Registrar of the AMHA, brought the matter up at a meeting of the AMHA Registry Committee in November 1991.

Members of the AMHA suspected that the plaintiff had bred a Morgan stallion to a non-Morgan mare, represented the foals as the offspring of Senora, and registered them as Morgans. To make the deception more difficult to uncover, the plaintiff submitted a blood sample from the non-Morgan mare, claiming that it was in fact the blood of Senora, whose blood had not been previously collected. In that way, the blood type of the foals would match the blood registered as Senora's.

As a result of their suspicions, the AMHA's Registry Committee began to investigate the plaintiff's business practices. The Registry Committee authorized Atwood to go to the

_____

[4]The facts pertinent to the investigation of and action against the plaintiff are recounted more fully in the New Hampshire Supreme Court's opinion in <u>Snow v. American Morgan Horse Ass'n</u>, 141 N.H. 467, 686 A.2d 1168 (1996).

3

plaintiff's farm to draw blood from Senora in order to check it against the foals attributed to her. Atwood was told by the plaintiff that Senora was not at the farm but was instead in the care of a veterinarian. Later, when the AMHA took further steps to obtain a sample of Senora's blood, the plaintiff informed Atwood that Senora had died prior to the date of the first inspection. The plaintiff reported that she was not aware of Senora's death at the time of the first inspection because she had just returned from a trip.

During the course of its investigation, the AMHA held two internal hearings, each of which generated an appeal. The AMHA investigation resulted in the expungement of the foals alleged by the plaintiff to be the progeny of Senora (the "Senora foals") and the expulsion of the plaintiff from the AMHA. The plaintiff's expulsion from the AMHA has ended her career as a breeder, trainer, and seller of Morgan horses.

2.   The State Court Action

The ongoing AMHA investigation interfered with the plaintiff's ability to sell the Senora foals and the ability of others to sell the progeny of the Senora foals. Accordingly, the plaintiff petitioned the New Hampshire Superior Court for preliminary injunctive relief and requested an order compelling

4

the AMHA to recognize the five foals as Senora's offspring.  The AMHA filed a two-count counterclaim alleging that the plaintiff had committed fraud and violated the New Hampshire Consumer Protection Act ("CPA") by falsely registering non-Morgans as Morgans.

The superior court denied the plaintiff's application for a preliminary injunction, and she withdrew, without prejudice, her claims against the AMHA and its officers.  See Snow v. American Morgan Horse Ass'n, 141 N.H. 467, 468, 686 A.2d 1168, 1169 (1996).  The court then tried the AMHA's counterclaims.  See id., 686 A.2d at 1169.  The superior court found that the plaintiff had committed fraud and violated the CPA by registering the non-Morgan Senora foals as Morgans.  See id., 686 A.2d at 1169.  It awarded the AMHA damages in the amount of $376,362.13 for the plaintiff's violation of the CPA.  See id., 686 A.2d at 1169-70.

The plaintiff appealed, and the New Hampshire Supreme Court upheld the trial court's finding that the AMHA had proved fraud by the plaintiff.  See id. at 470, 686 A.2d at 1171.  The court, however, reversed the superior court's finding of a CPA violation, holding that the CPA did not apply to the plaintiff's conduct because she did not conduct any trade or commerce with the AMHA.  See id. at 471, 686 A.2d at 1172.  The court remanded the case to the trial court for consideration of damages and

5

attorneys' fees arising from the plaintiff's fraud.  See id. at 472, 686 A.2d at 1172.

3.    The Current Action

While the state court action was pending, the plaintiff brought this action alleging that the defendants' conduct in investigating and expelling her from the AMHA violated the antitrust laws as well as various provisions of state law.  The gravamen of the plaintiff's complaint is that the AMHA arbitrarily and capriciously chose to pursue disciplinary action against her when other AMHA members who engaged in equally objectionable behavior went unpunished.  She contends that the AMHA's prosecution of her was an act calculated to eliminate a competitor in restraint of trade and that the AMHA's purported goals and objectives are a sham.  The plaintiff alleges that the AMHA hearings and appeals were not fair or impartial because of, inter alia, the following factors:  the Registry Committee used false and misleading statements as a basis to commence the initial investigation; the AMHA did not inform the plaintiff of the identity of her accuser; members of the committees that heard her case were competitors and therefore were not impartial; members of the committees had prejudged the outcome of the case; the testimony of witnesses was manipulated during the hearings;

and directors who had already found her guilty in the hearings were selected to serve on the appeals tribunal. In short, the plaintiff has attacked every facet of the defendants' actions.[5]

In her amended complaint, the plaintiff alleges the following claims: the defendants engaged in a group boycott and conspiracy in restraint of trade in violation of § 1 of the Sherman Act (count I); the defendants conspired to monopolize trade and commerce in the breeding, sale, and showing of Morgan horses in violation of § 2 of the Sherman Act (count II); the defendants intentionally and improperly interfered with contractual relations that the plaintiff had with third parties in violation of state law (count III); the defendants violated the New Hampshire CPA (count IV); the defendants defamed the plaintiff (count V); and the AMHA and Goodson violated the plaintiff's due process rights during the course of litigation against her by obtaining prejudgment attachments of her property under an allegedly unconstitutional statute (count VI).

---

[5]In addition, despite having been informed that the court will not allow the plaintiff to relitigate issues conclusively determined in the state court litigation, she has continued to suggest that the five expunged Senora foals were in fact the Morgan progeny of Senora and thus that she did not commit fraud. Those issues, however, were fully and conclusively litigated in the state court action and thus will not be reexamined here.

4.    <u>AMHA's Failures to Take Disciplinary Action Against Others</u>

The plaintiff's claims revolve around her allegation that the AMHA singled her out for disciplinary action not meted out to others and disproportion to the wrong she committed.  In support of her claim, the plaintiff points to the following episodes in which she asserts that the AMHA failed to take action against other AMHA members who engaged in conduct that violated AMHA rules.

Only one other non-Morgan has been expunged from the Registry.  Timberland Jon V, owned by Judy Whitney, was a horse of a race breed entered as a Morgan in a Morgan world race competition.  Timberland won by such a large margin that it raised suspicion as to its breed and it was discovered to be a non-Morgan.  Although the horse was expunged, no action was taken against Whitney, who remains a member in good standing of the AMHA.

The Morgan stallion Vanberbilt was born on June 8, 1980, and registered by Susan Marcotte.  Marcotte listed Shaker's Destry as Vanderbilt's sire.  In March 1993, while the investigation of the plaintiff was proceeding, defendant Atwood learned from the laboratory that performs blood tests for the AMHA that Shaker's Destry was probably not the sire of Vanderbilt.  Vanderbilt thus could have been fraudulently registered by Marcotte, but no

8

charges were ever brought against Marcotte and the progeny of Vanderbilt have not had their pedigree changed.

While the plaintiff was being investigated, an anonymous memorandum was sent to all members of the AMHA Board of Directors. The memo alleged that Thomas Caisse, a member of the Board and chairman of the AMHA Ethics Committee, was involved in the false registration of a mare he owned, Past Memories, as the daughter of the Morgan horse Wessex Melody when her real mother was Milady Bloomfield, a non-Morgan. The AMHA never investigated this accusation, and Caisse remains the head of the AMHA Ethics Committee.

The owners of three Morgan dams, Chesbrook Superman, Flamewood Surena, and Blackgold Excalibur, sent these dams to Ralph Curtis so they could be bred to his stallion Chasley Superman. Because Chasley Superman was going sterile, Curtis bred the mares to another stallion, Cedarbrook Sensation. The fraud was discovered through blood typing and the pedigrees of the foals were officially changed. No action was taken against Curtis, who at the time was a Director of the AMHA. Two years later he was appointed chairman of the AMHA Ethics Committee.

On February 19, 1992, defendant Atwood received information from Laura Gordon that a Morgan mare, Lost River Sanfield, was a "fake" and other information that foals from as many as three

9

different horses had been attributed to Lost River Sanfield.  The AMHA declined to investigate these charges.

The registration certificate of the mare Yellow Iris Jennifer lists her sire as Yellow Iris Brooke.  However, the AMHA has known since at least 1989 that Yellow Iris Brooke has been eliminated by blood testing as Yellow Iris Jennifer's sire.  The AMHA investigated the case, but was unable to determine the identity of Yellow Iris Jennifer's true sire.  Despite this, the AMHA Board of Directors voted to permit Yellow Iris Jennifer to remain in the registry with Yellow Iris Brooke as her recorded sire, permitting her to compete in the 1990 Grand National Show.

On May 6 or 7, 1995, after the conclusion of the superior court action against the plaintiff, the AMHA Board of Directors amended its rules to provide that, effective in May 1995, no horse that was registered as of December 31, 1991, could be expunged without the owner or breeder's consent.  The effect of this change in regulations is that what happened to the plaintiff and her horses cannot happen to any other established breeder.  The plaintiff alleges that all of these incidents demonstrate that the AMHA's asserted concern with protecting and preserving the integrity of the Registry is a sham.  She contends that her expulsion and the expungement of her horses was accomplished by

10

jealous competitors for the purpose of eliminating her from the market.

## Discussion

Defendant Wailes has moved to have the action against her dismissed pursuant to 11 U.S.C. § 727 because it was filed after she filed a voluntary petition for bankruptcy. Wailes listed the claim against her as a scheduled debt and the bankruptcy court has issued a discharge of Wailes from all dischargeable debts. The bankruptcy case was closed on September 22, 1997. Based on Wailes' motion to dismiss and accompanying attachments, the plaintiff's claim against Wailes appears to have been discharged by the bankruptcy proceedings. The plaintiff's response to Wailes' motion to dismiss was due on March 23, 1998. As of the date of this order, the plaintiff has not responded to the motion and has not requested additional time to do so. Therefore, the court grants defendant Wailes' motion to dismiss (document no. 82), ending her role as a defendant in the case.

The remaining defendants have moved for summary judgment on each count of the plaintiff's claims. The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154,

11

1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)).  The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving [parties are] entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The parties seeking summary judgment bear the initial burden of establishing the lack of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992).  The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'"  Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)).  However, once the defendants have submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).  The court considers the parties' arguments with respect to each of the plaintiff's claims seriatim.

## I.   Section 1 of the Sherman Act

Section 1 of the Sherman Act provides, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C.A. § 1 (West 1997).  Acts which violate § 1 are divided into two categories:  (1) per se violations, which intrinsically violate § 1; and (2) acts subject to rule of reason analysis, which only violate § 1 if they impose an unreasonable restraint on trade.  See State Oil Co. v. Khan, 118 S. Ct. 275, 279 (1997).  Actions that may impose an unreasonable restraint on trade under rule of reason analysis include the exclusion of market participants by associations such as the AMHA through the enforcement of otherwise legitimate disciplinary rules "in an arbitrary or discriminatory manner, or where the restraint is broader than necessary to accomplish the legitimate of the regulation."  Cooney v. American Horse Shows Ass'n, Inc., 495 F. Supp. 424, 431 (S.D.N.Y. 1980); see Carleton v. Vermont Dairy Herd Improvement Ass'n, 782 F. Supp. 926, 931-32 (D. Vt. 1991); McCreery Angus Farms v. American Angus Ass'n, 379 F. Supp. 1008, 1019 (S.D. Ill.), aff'd 506 F.2d 1404 (7th Cir. 1974); see also Pretz v. Holstein Friesian Ass'n of Am., 698 F. Supp. 1531, 1539-40 (D. Kan. 1988) (rule of reason analysis applied to question of

association action).

However, because the antitrust laws "were enacted for 'the protection of competition not competitors,'" Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Show Co. v. United States, 370 U.S. 294, 320 (1962)), to prevail in an antitrust claim predicated on arbitrary association action the plaintiff must prove not only that she was the victim of such action but also that she suffered antitrust injury, see id. at 488-89. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. at 489. In other words, the plaintiff must demonstrate not only that she suffered arbitrary action at the hands of the AMHA but also that the AMHA's acts harmed competition in the relevant market. See Turner v. Johnson & Johnson, 809 F.2d 90, 102 (1st Cir. 1986).

The parties agree that this case is subject to rule-of-reason analysis. The defendants argue that the plaintiff's § 1 claim should be dismissed because the AMHA's actions, to the extent that they restrained trade, did not unreasonably restrain trade because the pro-competitive benefits of its actions outweigh any negative anti-competitive effects. The defendants also contend that the plaintiff has not demonstrated that she suffered antitrust injury -- that is, that she has not adduced

14

sufficient evidence to raise a genuine issue of material fact tending to support the contention that any acts by the defendants unreasonably restricted competition.

The plaintiff responds that in antitrust cases where motive and intent are central issues, and particularly in rule of reason cases, summary judgment is inappropriate. She asserts that the restraint imposed by the defendants' acts is unreasonable because the defendants have not pursued their proffered goal of protecting the integrity of the Registry in other cases, revealing that their true purpose was an illegitimate desire to eliminate her from the Morgan show horse market.[6] The plaintiff further contends that competition in the Morgan show horse market was injured both by her expulsion and the expungement of the Senora foals.[7]

---

[6]The plaintiff's allegations refer to markets in Morgan show horses of three different geographic scopes:  New Hampshire, New England, and the United States.  The court refrains from defining the precise geographic scope of the relevant market at this time because neither the plaintiff nor the defendants have specified which  geographic market is proper.

[7]The plaintiff's claims that competition was damaged by the expungment of the Senora foals is untenable.  As the court has noted already, the Senora foals have been conclusively determined to be non-Morgans and the plaintiff may not relitigate the issue.  See supra note 5.  Therefore, their expungment from the Registry and removal from the Morgan show horse market could not have had a negative effect on competition in that market.  The plaintiff's only potentially cognizable claim of antitrust injury is that the defendants damaged competition by eliminating her as a source for Morgan horses other than the Senora foals.

The plaintiff's primary evidence in support of her claim that the defendants' actions were more restrictive than necessary to accomplish the legitimate goals of the AMHA is her account of other violations of AMHA policies which the AMHA failed to pursue or which resulted in less severe sanctions than those imposed on the plaintiff. The court has recounted those claims in detail in part four of the background section, supra. The court finds that these episodes raise a genuine issue of material fact as to whether the defendants were engaged in an effort to accomplish the legitimate ends of the AMHA or instead were engaged in a campaign to eliminate a successful competitor. Further, the court finds that the AMHA's adoption of the policy by which it can no longer expunge horses from the Registry without the consent of the owners raises a genuine issue of material fact on the question of whether the defendants were actually pursuing their articulated legitimate purpose of protecting the integrity of the Registry by investigating and disciplining the plaintiff. However, these conclusions, while indicating the existence of a genuine issue of material fact as to whether the defendants caused injury to the plaintiff as a competitor in the market for Morgan show horses do not in and of themselves raise a genuine issue of material fact as to the existence of an injury to competition.

16

The plaintiff's primary evidence in support of her claim that she suffered cognizable antitrust injury in the form of an injury to competition consists of the affidavits of two AMHA members who are familiar with the market for Morgan show horses. Both aver that the expulsion of the plaintiff from the AMHA has damaged the Morgan show horse market. See Pl.'s Obj. to Defs.' Mot. for Summ. J. ("Pl.'s Obj."), Exs. 30, 38.[8] The court finds

_____

[8]The affidavit of Cheryl Orcutt submitted by the plaintiff as evidence of the effect of the defendants' actions on the Morgan show horse market states, in part, the following:

> Since the AMHA began pursuing [the plaintiff], and at least in part as a result of AMHA's actions, all markets for Morgan show horses have declined. Fewer horses are being bred locally, regionally and nationally, and people are moving out of breeds. There has been a decline in the number of large, very competitive farms in the last four to five years. In New Hampshire, there are now only two major farms left . . . . The biggest effect has been felt in the northeast. Prior to 1991, the northeast was the center of the Morgan universe. One of the reasons for this was the effort of [the plaintiff]. She drew in customers from all over the country. This was good for everybody in the northeast, not just her. Buyers nationwide would schedule trips primarily to view [the plaintiff's] stock and plan to visit smaller breeders in Maine, New Hampshire, and Vermont at the same time. Such buying trips are not as frequent now. Additional [sic], the number of major breeders in the northeast has declined from up to fifteen to no more than twelve.

Pl.'s Obj., Ex. 30, ¶ 15. The affidavit of Douglas W. Coon, submitted for the same purpose, states, in part, the following:

> I believe that the Morgan Breeder's Sweepstakes that was begun by [the plaintiff] and Kelli Ross has suffered immensely. What initially was two divisions

17

that these affidavits satisfy the plaintiff's burden of demonstrating the existence of a genuine issue of material fact about whether the acts of the defendants resulted in harm to competition.

The court concludes that the plaintiff has successfully demonstrated the existence of a genuine issue of material fact with respect to her claim of a § 1 antitrust violation in count I. Therefore the court denies summary judgment as to the plaintiff's § 1 claims.

## II. Section 2 of the Sherman Act

Section 2 of the Sherman Act makes it unlawful to monopolize, or attempt to monopolize, or combine or

and $100,000.00 in prize money is now down to one division and $70,000.00, a loss of thirty percent from its inception. The Sweepstakes is the highest paying Morgan class in the country. It generated the most money from stallion owners who believed in their stallion's ability to produce superior offspring and therefore nominated them at a cost of $5,000.00 per year. It is apparent to me that the downsizing has hurt the Morgan industry.

Id., Ex. 38, ¶ 9.

18

conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . .

15 U.S.C.A. § 2 (West 1997). A monopoly offense is comprised of the following two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Monopoly power is "the power to control prices or exclude competition." United States v. E. I. Du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). "A single organization which exercises a dominant position in a given market does not violate section two unless it has 'acquired or maintained [its] strategic position, or sought to expand [its] monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1.'" Cooney v. American Horse Shows Ass'n, 495 F. Supp. 424, 433 (S.D.N.Y. 1980) (quoting United States v. Griffith, 334 U.S. 100, 106 (1948), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)).

The defendants argue that the plaintiff's monopolization claims must fail because the expulsion of the plaintiff from a market that includes thousands of AMHA members cannot be deemed

19

to be an attempt at achieving monopoly power. The defendants also argue that the plaintiff's allegation that the defendants conspired to create a monopoly is inconsistent with her assertion that the defendants already hold monopoly power over the relevant market. In addition, the defendants claim that the plaintiff's § 2 claim must fail because the plaintiff cannot demonstrate that the defendants acquired or maintained their monopoly by means of a restraint of trade cognizable under § 1.

The plaintiff responds that summary judgment should not be granted on this count because the defendants had the power to exclude competition in every segment of the market and used that power to exclude her from the market. She alleges that the same acts that form the core of her claim under § 1 of the Sherman Act, which the court has already ruled raise a genuine issue of material fact for trial, also raise a genuine issue with respect to her § 2 claim. The plaintiff asserts that the defendants restrained trade by instituting a "witch hunt" against her, causing other breeders to fear that the same actions might be taken against them in the future.

The parties agree that the AMHA exercises monopoly power over the Morgan show horse industry. The existence of monopoly power alone however does not violate § 2. See United States v. Swift & Co., 286 U.S. 106, 116 (1932). In Hatley v. American

20

<u>Quarter Horse Ass'n</u>, the Fifth Circuit dismissed a § 2 claim against the American Quarter Horse Association arising from failure to register a horse because the Association's rules "promote competition rather than hinder it" and "the Association's principals had no intent to use [its registration rule] for anticompetitive purposes." 552 F.2d 646, 654 (5th Cir. 1977). In this case, however, the plaintiff has alleged that the defendants acted with the anti-competitive purpose of eliminating her as a competitor. The allegations are akin to those accepted by the court as stating a cognizable § 2 claim in <u>Carleton v. Vermont Dairy Herd Improvement Ass'n</u>. <u>See</u> 782 F. Supp. 926, 935 (D. Vt. 1991). In that case, the defendants held a monopoly in the business of providing official milk testing services and allegedly used their market power "to distort competition in the business of breeding, raising, exhibiting and selling Holstein cattle, a market in which many of the defendants also compete, by willfully depriving a competitor in the latter market of services essential to compete effectively." <u>See</u> <u>id.</u> Here, the AMHA, which holds a monopoly in the registration of Morgan horses, along with the defendant AMHA members, many of whom breed, raise, exhibit, and sell Morgan horses, are alleged to have intentionally eliminated the plaintiff as a competitor in a way that distorts competition in the Morgan horse market. The court

21

therefore concludes that the plaintiff has demonstrated the existence of a genuine issue of material fact with respect to her monopolization claim and denies the defendants' motion for summary judgment on count II of the plaintiff's claims.


III. Wrongful Interference With Contractual Relationships

Under New Hampshire law, a plaintiff bringing a claim for tortious interference with contractual relations must show (1) that the plaintiff had a contractual relationship with a third party of which the defendant was aware; (2) that the defendant wrongfully induced the third party to breach the contract; and (3) that the damages claimed were proximately caused by the interference.  See Roberts v. General Motors Corp., 138 N.H. 532, 539 (1994).

The defendants assert that the plaintiff's claim in count III that the defendants wrongfully interfered with contractual relationships should be dismissed because the plaintiff has failed to allege required aspects of all three elements of her claim.  First, the defendants contend that the plaintiff has failed to identify any contractual relationships which the plaintiff had with third parties and to allege that the AMHA was aware of the contractual relationships.  Second, the defendants contend that the plaintiff fails to allege that the AMHA

22

wrongfully induced any third party to breach a contract with the plaintiff. Third, the defendants allege that the plaintiff fails to allege proximate causation of the damages suffered by the plaintiff. The plaintiff has not specifically addressed the defendants' arguments. The plaintiff merely "submits that the facts cited [in opposition to summary judgment on the antitrust claims in counts I and II] also raise material issues of fact relating to the remaining counts of the Complaint and that summary judgment must, therefore, be denied as to them as well." Pl.'s Obj. at 30.

The court finds that the defendants' motion for summary judgment is sufficiently supported to carry their initial burden of demonstrating a lack of a genuine issue of material fact on the second element of the plaintiff's claim by pointing to a lack of evidence that the defendants wrongfully induced any third party to breach a contract with the plaintiff. This shifts the burden to the plaintiff to come forward with the evidence in support of her claim.

The plaintiff's amended complaint fails to identify any specific contracts that have been breach, any specific individuals with whom the plaintiff had contracts, or the specific means by which the defendants wrongfully induced any individual to breach a contract with the plaintiff. She asserts

23

that the defendants' actions placed limits on her ability to transfer one of the Senora foals and four other Morgan horses unrelated to the investigation by refusing to accept transfers of those horses. See Am. Compl., ¶ 37. However, the AMHA properly refused to certify the transfer of one of the Senora foals as a Morgan because the then-pending investigation into the horse's pedigree revealed it conclusively to be a non-Morgan. See supra notes 5, 7. As to the four Morgan horses unrelated to the Senora investigation, the plaintiff's complaint indicates that the transfer of those horses was eventually allowed. See id. The remainder of the plaintiff's amended complaint contains nothing more than conclusory allegations, upon which she may not rest, in support of her claim. See Fed. R. Civ. P. 56(e). The plaintiff's response to the defendants' motion for summary judgment, which merely relies on her showing of evidence used to oppose summary judgment on the antitrust claims, also fails to identify any individual that the defendants wrongfully induced to breach any contract with the plaintiff. Therefore, the court grants the defendants' motion for summary judgment on the plaintiff's claims in count III.[9]

---

[9]Because of the court's conclusion that the plaintiff has failed to raise a genuine issue of material fact with respect to the second element of her claim, it need not reach the defendants' arguments that the plaintiff has also failed to adequately support the other elements of her claim.

IV.  Consumer Protection Act Claim

In count IV, the plaintiff alleges that the actions of the defendants in discovering, investigating, and punishing her constituted unfair or deceptive acts or practices in violation of New Hampshire's Consumer Protection Act ("CPA"), RSA § 358-A (1995).  The defendants argue that they are entitled to summary judgment on this claim because:  (1) their acts do not resemble the acts or practices set forth in section 2 of the CPA; and (2) the proscriptions of section 2 of the CPA are not implicated by Snow's dealings with the AMHA, as evidenced by the New Hampshire Supreme Court's opinion in Snow, 141 N.H. at 471, 686 A.2d at 1171-72, where it reversed the trial court's finding of a CPA violation.  As noted in part III, supra, the plaintiff has not responded specifically to the defendants' arguments on this count but has instead relied upon her showing of disputed factual issues with respect to the antitrust violations in counts I and II to raise a genuine issue of material fact with respect to her CPA claim.

The New Hampshire CPA provides, in pertinent part, the following:

It shall be unlawful for any person to use any unfair
method of competition or any unfair or deceptive act or

25

> practice in the conduct of any trade or commerce within
> this state.

RSA § 358-A:2 (1995).  "Trade" and "commerce" within the meaning

of the statute include

> the advertising, offering for sale, sale, or distribu-
> tion of any services and any property, tangible or
> intangible, real, personal or mixed, and any other
> article, commodity, or thing of value wherever situate,
> and shall include any trade or commerce directly or
> indirectly affecting the people of this state.

RSA § 358-A:1 (1995).  In the Snow case, the New Hampshire

Supreme Court found that "Snow's act of fraudulently registering

foals fails to satisfy the statute's definition of trade or

commerce."  Snow, 141 N.H. at 471, 686 A.2d at 1171-72.  Snow's

allegations that the defendants intentionally drove her out of

business by expunging her horses from the Registry and expelling

her from the AMHA similarly do not satisfy the CPA's definition

of "trade or commerce."  Although such actions may have had an

indirect effect on trade or commerce, they do not constitute the

advertising, offering for sale, sale, or distribution of services

or property.

The court finds that the defendants have satisfied their

initial burden of demonstrating the lack of a genuine issue of

material fact on the plaintiff's Consumer Protection Act claim,

shifting the burden to the plaintiff to demonstrate the existence

of a genuine issue of material fact requiring a trial.  The court

26

also finds that the plaintiff's reliance on the facts raised in the context of her antitrust claim are inapposite to her CPA claim and therefore fail to satisfy her burden of demonstrating that a genuine issue of material fact remains for trial. For this reason, the court grants summary judgment to the defendants on the plaintiff's Consumer Protection Act claim in count IV.

V.    Defamation

In count V, the plaintiff alleges that the defendants defamed her by publishing statements "including but not limited to statements to the effect that plaintiff defrauded the Registry and that Senora was not the dam of the foals as claimed by plaintiff." Am. Compl., ¶ 64. The defendants assert that they are entitled to summary judgment on this count because any statements that the plaintiff defrauded the Registry and that Senora was not the dam of the foals as claimed by the plaintiff are true. See Simpkins v. Snow, 139 N.H. 735, 740, 661 A.2d 772, 776 (1995) ("A statement is not actionable if it is substantially true."). As noted in part III, supra, the plaintiff has not responded specifically to the defendants' arguments on this count but has instead relied upon her factual showing with respect to the antitrust violations to raise a genuine issue of material fact with respect to her defamation claim. In addition, the

27

plaintiff has failed to identify any further statements which she alleges are defamatory.

The AMHA proved the truth of the allegedly defamatory statements - that the plaintiff defrauded the AMHA by falsely registering five foals as offspring of Senora - in the state court action. See Snow, 141 N.H. at 470, 686 A.2d at 1171. As the court has already noted, that finding is binding on the plaintiff in this action. The defendants have satisfied their initial burden of demonstrating the lack of a genuine issue of material fact and the plaintiff has not satisfied her burden of demonstrating that a material issue of fact requires a trial. Therefore, the court grants summary judgment on the plaintiff's defamation claim against the defendants in count V.

VI.  Due Process Violation

In count VI, the plaintiff alleges that the actions of two of the defendants, the AMHA and Goodson, seeking prejudgment attachment of her assets denied her due process rights because the New Hampshire prejudgment attachment statute, N.H. Rev. Stat. Ann. ("RSA") § 511-A, is unconstitutional. Specifically, she contends as follows:

> RSA § 511-A as written and as applied by the Superior Courts of this State violates the Fourteenth Amendment of the United States Constitution which

28

> prohibits any state from depriving any person of
> rights, privileges, immunities or property without due
> process of law by, among other things, failing to
> require the posting of a bond, the use of summary
> procedures, and the failure to provide sufficient
> safeguards to ensure that a defendant is not caused
> unnecessary harm.

Am. Compl., ¶ 79.

The plaintiff's claim arises from the prejudgment attachment of her assets by the AMHA and Goodson in litigation related to the Senora foals. In support of her claim, she asserts the following facts. The AMHA's attachment was obtained during the course of the Snow litigation already described. Goodson filed her own lawsuit against the plaintiff in Coos County Superior Court. See Goodson v. Snow, No. 93-C-60 (1993). In connection with that action, Goodson sought and received an ex parte prejudgment attachment on the plaintiff's bank accounts and real estate in an amount equal to $500,000. Goodson's underlying complaint, however, arose out of two transactions totaling $3,800 in value. Both attachments were still in place as of the filing of the plaintiff's Amended Complaint.

The defendants allege several additional facts not contested by the plaintiff. The AMHA's attachment was granted after a hearing on its application. The plaintiff requested no bond in connection with the attachment, did not seek reconsideration of the attachment order, sought no reduction or discharge of the

attachment, and sought no review of the attachment order, either by specific petition or on her appeal of the case to the New Hampshire Supreme Court. The plaintiff also failed to avail herself of similar opportunities for review of Goodson's attachment.

The defendants argue that the plaintiff's due process claim must be dismissed because § 511-A is not unconstitutional. They assert that the plaintiff did not pursue avenues which might have led to an order that a bond be posted and that the absence of a bond requirement in § 511-A is not constitutionally significant. They contend that the plaintiff has specified neither the "summary procedures" available under § 511-A that she believes make it unconstitutional nor the "safeguards" whose absence make it constitutionally infirm. As noted in part III, supra, the plaintiff has not responded specifically to the defendants' arguments on this count but has instead relied upon her showing of factual issues with respect to the alleged antitrust violations to raise a genuine issue of material fact with respect to her due process claim.

The assertions of the plaintiff that raise a genuine issue of material fact with respect to her antitrust claims fail to do so for her due process claim. The due process claim is based on attachments obtained during litigation subsequent to the

30

defendants' alleged antitrust violations. It is factually distinct from the defendants' alleged antitrust violations and raises different legal issues. Given the lack of detailed argument by the plaintiff and her failure to rebut the defendants' claims that RSA § 511-A is constitutional, the court's inquiry into the constitutionality of New Hampshire's prejudgment attachment scheme is circumscribed to the question of whether it obviously fails to meet the minimum requirements of due process. Cf. Kensington Rock Island Ltd. Partnership v. American Eagle Historic Partners, 921 F.2d 122, 125 (7th Cir. 1990) ("'A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.'"), cited with approval in Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 41 (1st Cir. 1993).

In Connecticut v. Doehr, the Supreme Court of the United States held that a Connecticut prejudgment attachment statute was unconstitutional because it authorized prejudgment attachment of real estate without prior notice or hearing, without a showing of extraordinary circumstances, and without a requirement that the person seeking the attachment post a bond. See 501 U.S. 1, 4 (1991). The court stated that the relevant inquiry for determining whether a prejudgment attachment statute comports

with the requirements of due process is as follows:

> [F]irst, consideration of the private interest that will be affected by the prejudgment measure; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, . . . principal attention to the interest of the party seeking the prejudgment remedy, with . . . due regard for any ancillary interest the government might have in providing the procedure or forgoing the added burden of providing greater protections.

Id. at 11.  Although "the property interests that attachment affects are significant," id., the Court declined to adopt a per se requirement that a bond be posted by a party seeking prejudgment attachment in every case, see id. at 18-21 (minority of Court indicating that bond required but majority not reaching the issue).

The New Hampshire prejudgment attachment statute, unlike the statute struck down in Doehr, allows a prejudgment attachment without a hearing only upon the occurrence of one of a list of exceptional circumstances.  See RSA § 511-A:8.  In addition, "[i]n all cases of attachment made ex parte the court may impose reasonable conditions thereon and a hearing shall be granted as promptly as possible upon the subsequent request of a defendant." Id.  This procedure allows the court to impose a bond requirement.

The court holds that RSA § 511-A is not unconstitutional on its face and the plaintiff has not demonstrated that its

32

application in this case deprived her of her due process rights. The plaintiff's failure to rebut the defendants' arguments with specific facts and legal arguments in support of her position is fatal to her claim. The court grants summary judgment on the plaintiff's due process claim in count VI.

Conclusion

For the reasons stated above, the court grants defendant Wailes' motion to dismiss (document no. 82), ending her role as a defendant in the case. The court also grants the summary judgment motions of defendant Goodson (document no. 72) and the remaining defendants (document no. 73) as to counts III, IV, V, and VI but denies the motions as to counts I and II.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

May 8, 1998

cc:  John C. Gage, Esquire
     Howard B. Myers, Esquire
     Irvin D. Gordon, Esquire
     Kevin C. Maynard, Esquire
     Jack P. Crisp Jr., Esquire