## MAXINE W. SNOW

v.

## AMERICAN MORGAN HORSE ASSOCIATION, INC.

December 5, 1996

*Brown, Olson & Wilson, P.C.*, of Concord (*Howard B. Myers* and *Bryan K. Gould* on the brief, and *Mr. Myers* orally), and *Sheehan, Phinney, Bass + Green, P.A.*, of Manchester (*Daniel J. Lynch* and *James E. Higgins* on the brief), for the plaintiff.

*Sulloway & Hollis*, of Concord (*Irvin D. Gordon* and *Edward C. Mosca* on the brief, and *Mr. Gordon* orally), for the defendant.

THAYER, J. The plaintiff and counterclaim defendant, Maxine W. Snow, appeals a judgment of the Superior Court (*Morrill*, J.) finding that she committed fraud and violated the New Hampshire Consumer Protection Act, *see* RSA ch. 358-A (1995), when she registered five foals as offspring of a Morgan mare, Senora Showblez Vona (Senora). On appeal, Snow argues that the trial court erroneously: (1) found that she engaged in fraud; (2) applied the Consumer Protection Act to her conduct; (3) awarded damages to the American

Morgan Horse Association, Inc. (AMHA); and (4) denied her request for a jury trial. We affirm in part, reverse in part, and remand.

Snow was involved in the Morgan horse business for almost twenty years. During that time, she was a member of the AMHA, a nonprofit association dedicated to the preservation and promotion of the Morgan horse breed. The AMHA's primary function is to maintain accurate records of the bloodlines of purebred Morgan horses. To accomplish this function, the AMHA keeps a registry of existing Morgan horses which it updates by taking blood samples from newborn foals.

In 1991 and 1992, the AMHA suspected that Snow had falsely certified five foals as offspring of Senora. As a result, the AMHA's Registry Committee began an investigation into Snow's business practices. Because the investigation interfered with Snow's ability to sell the foals in question, she petitioned for preliminary injunctive relief and requested an order compelling the AMHA to recognize the five foals as Senora's offspring. The AMHA filed a two-count counterclaim alleging that Snow committed fraud and violated the Consumer Protection Act.

After the superior court denied her application for a preliminary injunction, Snow withdrew, without prejudice, her claims against the AMHA and its officers. The case then went to trial on AMHA's counterclaims. The superior court found that Snow had committed fraud and violated the Consumer Protection Act. It awarded the AMHA damages in the amount of $376,362.13 for Snow's Consumer Protection Act violation. This appeal followed.

*I. Fraud*

Snow argues first that the AMHA failed to prove fraud by clear and convincing evidence. We disagree.

The scope of our review of the trial court's factual findings is narrow. *Concord Steam Corp. v. City of Concord*, 128 N.H. 724, 727, 519 A.2d 266, 269 (1986). "This court will not disturb the decision of the trier of fact unless the findings are clearly erroneous." *Dimick v. Lewis*, 127 N.H. 141, 144, 497 A.2d 1221, 1223 (1985).

■ The party alleging fraud "must prove that the [other party] intentionally made material false statements . . ., which [she] knew to be false or which [s]he had no knowledge or belief were true, for the purpose of causing, and which does cause, the [party alleging fraud] reasonably to rely to his detriment." *Caledonia, Inc. v. Trainor*, 123 N.H. 116, 124, 459 A.2d 613, 617-18 (1983) (citations omitted). "Fraud must be proved by clear and convincing evidence, but such proof may be founded upon circumstantial evidence." *Id.*, 459 A.2d at 618.

The trial court found the following facts, all of which are well-supported by the record. In late May 1986, Nancy Odams, owner of Senora, was approached by Snow's partner, Bill Thomas, who said that he had been hired to purchase Senora for an "elderly couple." Odams agreed to the sale. On June 22, 1986, Snow, who was introduced as a friend of the "elderly couple," gave Odams a check for $1,200 to cover the purchase price of Senora. The superior court found, however, that no "elderly couple" planned to take Senora; instead, the Thomas and Snow partnership became Senora's registered owners.

During the next five years, Snow registered five foals with the AMHA, each of which she represented as an offspring of Senora. The first foal was born on April 6, 1987. Because the normal gestation period of a Morgan mare is eleven months, that foal would probably have been conceived in early May 1986. Yet the trial court found that the earliest date that Senora could have been purchased was May 23 or 24. Furthermore, Thomas and Snow did not take immediate possession of the horse after their purchase as they agreed to leave Senora with Odams until late summer.

Odams stated that Snow and her partner had not taken actual possession of Senora until August 1986. Additionally, Odams testified that neither Snow nor her partner mentioned that they had inseminated Senora prior to her delivery, and even Snow admitted that horse breeders do not go onto another's property to inseminate a mare they do not own.

Other witnesses also questioned whether Senora could have been the dam. For example, Pauline Villeneuve, who housed Senora at her barn in 1986, testified that no one came on to her property to inseminate Senora in early May of that year. Several other witnesses stated that it would be unusual for a mare of Senora's age (twenty-five), who had never before produced a foal, to give birth to five offspring.

Finally, other witnesses questioned blood samples on file at the AMHA. In March 1987, Snow submitted to the AMHA's blood-typing laboratory a blood sample drawn by Dr. Virginia Prince which Snow claimed was from Senora, and which matched the blood sample taken from the foal conceived in early May 1986. Evidence introduced at trial, however, indicated that the dam whose blood Snow submitted might not have been Senora. Furthermore, the superior court found that Snow told Prince she would send the vials to the AMHA laboratory herself, permitting the inference that Snow had substituted a non-Morgan mare's blood for the samples allegedly taken from Senora.

During the next four years, Snow submitted "Registration Applications" for four additional foals, each of which she represented as Senora's foals. The parties agree that each of those foals, along with the first foal born in 1987, were offspring of the same dam.

In 1991, following the birth of the last of the foals, the AMHA began its investigation of Snow. The superior court found that Snow's behavior during the investigation was suspicious. For one thing, following the onset of the AMHA investigation, Snow moved Senora from her farm in New Hampshire to a location in Rhode Island, allegedly to prevent colic. When the AMHA's Registrar made an initial visit to Snow's farm in October, however, Snow advised the Registrar that Senora was at an unidentified "vet clinic."

Two months later, on December 10, 1991, the AMHA's Registrar returned to Snow's farm with a veterinarian to take a blood sample from Senora so that it could be compared with the blood sample previously submitted by Snow under Senora's name. Snow informed the Registrar that Senora was in Rhode Island. She initially agreed to allow the Registrar to drive to Rhode Island to take the blood sample, but later refused, citing the AMHA's unwillingness to identify her accusers.

During the next seven months, the AMHA made repeated requests for hair and blood samples from Senora. Snow refused. She never indicated that her reason for refusing the requests was that Senora had, in fact, died; on the contrary, she continued to indicate that the horse was alive.

In July 1992, Snow was ordered to produce Senora for blood testing by the superior court in a separate action brought against Snow by a purchaser of one of the foals at issue here. Snow responded by filing a "Death Report Form" indicating that Senora had died on December 2, 1991. The date of death was one week before Snow told the AMHA Registrar who visited her farm that Senora was in Rhode Island. Snow contended, however, that she had not been informed of Senora's death at the time of the Registrar's visit.

■ The evidence and the reasonable inferences drawn therefrom, amply support the trial court's finding that Snow intentionally defrauded the AMHA by falsely registering five foals with the AMHA as offspring of the registered Morgan mare, Senora. Furthermore, based on the evidence, the trial court could have reasonably concluded that the AMHA reasonably relied upon Snow's fraudulent registrations to its detriment by accepting Snow's registration applications and, as a result, issuing parentage certif-

icates for the fraudulently registered foals. Accordingly, we cannot say that the trial court's finding of fraud was clearly erroneous.

## II. Consumer Protection Act

■ Snow next argues that the trial court committed reversible error by applying the Consumer Protection Act to Snow's registering the foals as Senora's offspring with the AMHA. Snow essentially contends that she did not conduct any trade or commerce with the AMHA because she never sold or offered to sell the foals to the AMHA, but merely registered the foals with the AMHA. We agree.

"The issue before us is a matter of statutory construction; accordingly, we must begin our analysis by considering the plain meaning of the words of the statute." *Gilmore v. Bradgate Assocs.*, 135 N.H. 234, 237, 604 A.2d 555, 556 (1992). "In so doing, we will focus on the statute as a whole, not on isolated words or phrases." *Roberts v. General Motors Corp.*, 138 N.H. 532, 536, 643 A.2d 956, 958 (1994).

The Consumer Protection Act provides, in relevant part: "It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any *trade or commerce* within this state." RSA 358-A:2 (1995) (emphasis added). The statute defines "trade" and "commerce" as including "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state." RSA 358-A:1, II (1995). The consumer bears the initial burden of establishing a Consumer Protection Act violation, which necessarily includes establishing that the violating practice occurred in trade or commerce. *McMullin v. Downing*, 135 N.H. 675, 680, 609 A.2d 1226, 1230 (1992).

■ In the present case, Snow fraudulently registered foals as Senora's offspring with the AMHA. As far as the AMHA is concerned, Snow's act of fraudulently registering foals fails to satisfy the statute's definition of trade or commerce. Registering foals is not a transaction involving either "advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate." RSA 358-A:1, II. Accordingly, we reverse the trial court's finding that Snow's fraudulent dealings with the AMHA implicated the Consumer Protection Act.

## III. Damages

The trial court awarded AMHA damages based on its finding that Snow violated the Consumer Protection Act. The trial court acknowledged that it did not consider what damages and attorneys' fees AMHA might have been entitled to recover for Snow's fraud. As the trial court erroneously applied the Consumer Protection Act to Snow's conduct, we reverse the court's award of damages and remand the case for consideration of what recoverable damages AMHA incurred as a result of Snow's fraud. Accordingly, we need not consider Snow's other arguments regarding the trial court's damage award.

## IV. Jury Trial

Lastly, Snow argues that the superior court unconstitutionally denied her a jury trial. Snow initiated this case by filing a petition for a preliminary injunction against the AMHA. On October 9, 1992, AMHA filed a two-count counterclaim alleging Snow engaged in fraud and violated the Consumer Protection Act. After a hearing in October 1992, the superior court found Snow had an adequate alternative remedy in AMHA's internal hearing procedures and denied Snow's request for an injunction. Subsequently, the superior court explicitly noted in a pretrial conference report dated January 26, 1993, that the parties had not requested a jury trial. On June 21, 1993, some seven and one half months later, Snow filed a motion requesting, among other things, leave to file an answer and an amended complaint, a continuance of the trial date, and an order granting a jury trial.

█ The superior court granted Snow's motion to extend deadlines and continue the trial's date. Additionally, the superior court ruled that Snow's other requests were "[m]oot in light of amended trial schedule and granting of motion to extend discovery deadlines and continue trial date." Since the court did not address her jury trial request specifically, Snow should have requested clarification of the court's order. In any event, Snow should have timely objected at trial to trying the case to a judge and not a jury. Instead, Snow proceeded to present her case and submitted it to the court. Accordingly, Snow did not properly preserve the issue below. It is settled in this jurisdiction that "[w]e will not review on appeal constitutional issues not presented below." *Hansel v. City of Keene*, 138 N.H. 99, 105, 634 A.2d 1351, 1355 (1993). Furthermore, Snow effectively waived any claim she had to a jury trial by proceeding, without objection, in a bench trial. *See Hatch v. Hillsgrove*, 83 N.H.

91, 93-94, 138 A. 428, 430, *rev'd on rehearing on other grounds*, 83 N.H. 91, 96-98, 139 A. 366 (1927).

*Affirmed in part; reversed in part; remanded.*

All concurred.