Anheuser-Busch v. Caught-on-Bleu          CV-02-196-JD   07/22/03

UNITED STATES DISTRICT COURT FOR THE
                           DISTRICT OF NEW HAMPSHIRE


<u>Anheuser-Busch, Inc.</u>

      v.                              Civil No. 02-196-JD
                                      Opinion No. 2003 DNH 127
<u>Caught-on-Bleu, Inc.</u>

                         O R D E R


     The plaintiff, Anheuser-Busch, Inc., brings suit against the
defendant, Caught-on-Bleu, Inc., for trademark infringement,
trademark dilution, and unfair competition under the Trademark
Act of 1946, 15 U.S.C. §§ 1051-1127 ("the Lanham Act"), for
trademark dilution under New Hampshire Revised Statutes Annotated
("RSA") § 350-A:12, and for trademark infringement and unfair
competition under the common law.  Caught-on-Bleu brings
counterclaims for tortious interference, reverse confusion, and
unfair competition in violation of RSA 358-A.  The plaintiff
moves for summary judgment as to the defendant's counterclaims,
(document no. 41) to which the defendant objects (document no.
55).

                         <u>Background</u>[1]

_____Anheuser-Busch ("A-B") and its predecessors have brewed and

-------------------------------------------------

     [1]Only Anheuser-Busch has provided a factual statement as
required by Local Rule 7.2(b).  Therefore, pursuant to the
requirements of rule 7.2(b), all properly supported facts
provided by Anheuser-Busch are deemed admitted for purposes of
summary judgment.  LR 7.2(b)(2).  To the extent that Caught-on-
Bleu has stated contrary facts in its objection and supported
such facts with precise citation to the record, the court will
consider such facts to be in dispute.

marketed beer in the United States under the trademark "Budweiser" since 1876. Within years of its introduction, the public came to abbreviate the beer with the now familiar moniker, "Bud." At least as early as the 1930s, A-B began marketing Budweiser using the abbreviation "Bud." For example, A-B placed the word "Bud" on beer taps distributed to bars. A-B has capitalized on the Bud mark over the years by creating what it calls a "family" of beers including "Bud Light," "Bud Dry," and "Bud Ice." In the United States, Bud Light is the top-selling brand of beer and its predecessor, Budweiser, is the second-best selling brand of beer.

The Budweiser mark has been federally registered since 1878 and is owned by A-B under United States Trademark Registration 922,481 for beer and 952,277 for beer and malt liquor. Some of the many Budweiser-related, federally-registered trademarks owned by A-B include: "Bud," for beer, registered in 1958 under 666,367; "Bud Man," for beer, registered in 1974 under 999,817; "Bud Light," for beer, registered in 1983 under 1,261,873; "Bud Bowl," for beer, registered in 1989 under 1,567,443; "Bud Dry," for beer, registered in 1989 under 1,567,446; and "Bud Ice," for beer, registered in 2001 under 2,501,706. The term "Bud mark" will be used hereinafter to refer to any of A-B's Budweiser-related trademarks.

A-B has extensively promoted and advertised the Bud mark in connection with beer. Much of the advertising and promotion of

the Budweiser family of beers explicitly incorporates the Bud mark. Such promotion includes the widely-known slogans "This Bud's for You" and "Make it a Bud Light." Prominent advertising campaigns have been crafted around the Bud mark, including the "Bud Bowl" in which Budweiser and Bud Light teams comprised of beer bottles play a football game during commercial breaks in the National Football League's Super Bowl.

Billy Budd Classic American Ale is the brainchild of Lisamarie Sapuppo-Bertrand, President of Caught-on-Bleu ("C-0-B"), and Bernice Keeney, C-0-B's Vice President. Sapuppo-Bertrand claims that she decided Billy Budd, the main character of Herman Melville's novel <u>Billy Budd</u>, would make an effective trademark for a product. After considering use of Billy Budd for several different products, including salad dressing, shampoo, and cologne, Sapuppo-Bertrand and Keeney decided to use Billy Budd as the name of a beer because "it suited perhaps a beer more than any other product." <u>See</u> Keeney Dep. at 52.

In October of 1997, C-0-B filed intent-to-use application number 75-381682 to register the mark "Billy Budd" with the Patent and Trademark Office of the United States ("P.T.O.") for "[b]eers, mineral and aerated waters and other non-alcoholic drinks; fruit drinks and fruit juices." <u>See</u> Keeney Dep. Ex. 11. This application was later amended by substituting the word "Ales" for the list of other possible beverages. <u>See</u> <u>id.</u> C-0-B's application for the proposed trademark was published in the

3

August 24, 1999, edition of the Official Gazette of the P.T.O. pursuant to P.T.O. rules.[2]

In August of 1999, A-B timely sought and obtained an extension of time to oppose this application. A-B's counsel thereafter contacted C-0-B seeking voluntary abandonment of the application and an agreement not to use the proposed mark in connection with beer. In February of 2000, after C-0-B refused A-B's entreaties, A-B filed notice of opposition number 119,037 with the P.T.O. After a series of proceedings and a period of discovery before the P.T.O., A-B filed this action for injunctive relief.

In October and November of 1999, kegs of the defendant's beer were distributed in New Hampshire through a brewing and distribution agreement between C-O-B and New Hampshire Custom Brewers ("N.H.C.B."). The distribution was limited to a Brewfest at New Hampshire College[3] and the bars at four New Hampshire establishments. With these kegs, C-0-B also provided tap handles bearing the words "Billy Budd." C-0-B and others have

_____

[2]Publication in the Official Gazette provides parties, who believe that they may be damaged by the proposed mark's registration, thirty days to file a notice of opposition or a request for an extension of time to do so. 15 U.S.C. § 1063(a).

[3]New Hampshire College has since been renamed Southern New Hampshire University.

interchangeably referred to the beer as "Billy Budd" and "Billy Budd Classic American Ale."  <u>See, e.g.</u>, Kenny Dep. at 98-106, 111-12, Ex. 3A.

<u>Standard of Review</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party.  <u>See</u> <u>id.</u> at 255.  "On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991). "[A]n absence of evidence on a critical issue weighs against the

5

party . . . who would bear the burden of proof on that issue at trial." Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001).

## Discussion

### I. Continuance

C-O-B argues that summary judgment is premature at this time because it has not been able to procure discovery from Great State Beverages ("G.S.B."), a distributor of A-B products and a non-party to this case. C-O-B's assertions essentially seek relief under Federal Rule of Civil Procedure 56(f).

Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f). "A party who wishes to forestall ruling on summary judgment because material discovery has not been taken is obliged to file an affidavit under Federal Rule of Civil Procedure 56(f)." Ricci v. Alternative Energy, Inc., 211 F.3d 157, 159 n.1 (1st Cir. 2000). "An opponent of a summary judgment motion need not follow the exact letter of Rule 56(f) in order to

obtain its benefits. Nevertheless, he departs from the plain language of the rule at his peril." <u>Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985, 988 (1st Cir. 1988).

C-O-B has offered neither an affidavit nor any other information detailing why it is entitled to additional discovery. The court has no basis on which it can reasonably conclude that C-O-B has been diligent in its discovery efforts. <u>See</u> <u>Simas v. First Citizens' Fed. Credit Union</u>, 170 F.3d 37, 45 n.4 (1st Cir. 1999) (a movant must generally show that he "has been diligent in conducting discovery, and show 'good cause' why the additional discovery was not previously practicable with reasonable diligence") (citing <u>C.B. Trucking, Inc. v. Waste Mgmt., Inc.</u>, 137 F.3d 41, 44 & n.2 (1st Cir. 1998)).

Furthermore, to succeed on a Rule 56(f) motion, defendants must present a "plausible basis for a belief that discoverable materials exist that would likely suffice to raise a genuine issue of material fact and, thus, defeat summary judgment." <u>Resolution Trust Corp. v. North Bridge Assocs., Inc.</u> 22 F.3d 1198, 1206 (1st Cir. 1994) (citing <u>Nestor Colon Medina & Sucesores, Inc. v. Custodio</u>, 964 F.2d 32, 38 (1st Cir. 1992); <u>Price v. Gen. Motors Corp.</u>, 931 F.2d 162, 164 (1st Cir. 1991). C-O-B has not shown that the discovery it seeks to conduct will raise a genuine issue of material fact sufficient to defeat A-B's

7

motion for summary judgment.  The speculative assertions of C-O-B
are insufficient to justify further delay in ruling on this
motion.[4]


II.   Tortious Interference

The first of C-O-B's counterclaims alleges that A-B's
contact with N.H.C.B., the brewer and distributor of C-O-B's
Billy Budd Classic American Ale ("Billy Budd Ale"), caused
N.H.C.B. to cease production and distribution of Billy Budd Ale.
To prevail on its claim of tortious interference with a
contractual relationship, C-O-B "must show that [it] had a
contractual relationship with a third party [N.H.C.B.]; that [A-
B] knew of the contractual relationship . . . ; and that [A-B]
wrongfully induced [N.H.C.B.] to breach [its] agreement with [C-
O-B]."  Barrows v. Boles, 141 N.H. 382, 392-93 (1996) (citing
Montrone v. Maxfield, 122 N.H. 724, 726 (1982)); see also Nat'l
Empl. Serv. Corp. v. Olsten Staffing Serv., Inc., 145 N.H. 158,
162 (2000).  "Only improper interference is deemed tortious in
New Hampshire."  Roberts v. Gen. Motors Corp., 138 N.H. 532, 540
(1994)).

A-B does not dispute the existence of a valid contract

---

[4]The court has already directly addressed the defendant's
discovery concerns in the orders of March 31, 2003 (document. no.
50), and April 14, 2003 (document no. 51).

8

between C-O-B and N.H.C.B.

a.    <u>Knowledge of Contractual Relationship</u>

With respect to A-B's knowledge of a contractual relationship between C-O-B and N.H.C.B., A-B offers the sworn declarations of LaTonya Washington, an Associate General Counsel in A-B's legal department, and Michael W. Rafter, an attorney with Kilpatrick Stockton LLP, A-B's outside trademark counsel. Washington and Rafter state that A-B was not aware that C-O-B had a contract with N.H.C.B. until April of 2001, when that contract was revealed to A-B during proceedings before the P.T.O. <u>See</u> Washington Decl. ¶ 6; Rafter Decl. ¶¶ 19-21. In contrast, C-O-B contends A-B was aware of the contract in 1999, before N.H.C.B. ceased production and distribution of Billy Budd Ale.

C-O-B points to a conversation between a representative of G.S.B. and Jason Ward, an employee of N.H.C.B. Ward states in his declaration, that at the New England College Brewfest in October of 1999, the G.S.B. representative "commented on the name of Billy Budd Classic American Ale and inquired whether this was one of NHCB's new products or was it a beer that the brewery was contracted to produce." Ward Decl. ¶ 7. Ward describes the conversation as having been "about the Billy Budd Classic American Ale and how the brewery was surviving on the new self-

9

distribution efforts and if I was incurring a lot of trouble getting our products on the shelf." Ward Decl. ¶ 7. Ward's statement does not indicate that he mentioned C-O-B to the G.S.B. representative, nor that Billy Budd Ale was made pursuant to a contract with C-O-B.

C-O-B also does not offer any evidence that the unidentified representative from G.S.B. contacted A-B about this conversation. G.S.B. is a corporate entity distinct from A-B. C-O-B has not suggested that the court should impute G.S.B.'s knowledge to A-B, nor would it be reasonable to do so on the record presented. A-B, to the contrary, offers the sworn declaration of Michael McGinn, the Vice President and General Manager of G.S.B., who avers that G.S.B. "never had any communication with Anheuser-Busch regarding Caught-on-Blue, Inc., BILLY BUDD CLASSIC AMERICAN ALE, or the BILLY BUDD name prior to May 31, 2001. . . ." McGinn Decl. ¶ 5.

Nevertheless, C-O-B asks the court not only to infer the details of the conversation between Ward and the G.S.B. representative, but also to infer subsequent communication between the G.S.B. representative and A-B. The only support C-O-B offers for this inference is the deposition of William Gannon, an attorney who represented N.H.C.B. in bankruptcy proceedings during October and November of 1999. He states that he may have

10

received a call from A-B about Billy Budd Ale. Gannon "ha[d] a sense -- and ha[s] always had a sense, that there was a relatively brief call where somebody essentially said, you know, we are going to protect our trademark right or whatever you would call it." Gannon Dep. at 37-38. At the deposition, in answer to a question whether the call could have been from a lawyer for the distributor, Gannon replied that "[i]t could have been anybody as -- well, I don't mean to really say it could have been anybody, but I don't know who it was from." Gannon Dep. at 38. A-B argues that Gannon's deposition testimony about this phone call should not be considered on summary judgment on the ground that the testimony is inadmissible at trial. A-B contends that the call cannot be authenticated and the contents of the call constitute hearsay.

The court need not resolve that issue, because the evidence C-O-B offers, even when taken as true and admissible, fails to demonstrate a factual dispute as to whether A-B was aware of the contractual relationship between C-O-B and N.H.C.B. Accepting that Gannon received a call from a representative of A-B, this only indicates that A-B may have known that N.H.C.B. was involved in the production of Billy Budd Ale. Nowhere in Gannon's testimony does he indicate that the caller was aware of the existence of C-O-B. Gannon's deposition testimony does not

11

support a reasonable inference that A-B knew that Billy Budd Ale was made and distributed by N.H.C.B. pursuant to a contract between N.H.C.B. and C-O-B.

Taking all of C-O-B's evidence as true and drawing all reasonable inferences in its favor, C-0-B has provided no basis on which the court can conclude that A-B was aware of the contract between C-0-B and N.H.C.B. until April of 2001, long after N.H.C.B. had ended its contractual relationship with C-O-B in 1999. "'Mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact.'" Soto-Ocasio v. Fed. Express Corp., 150 F.3d 14, 18 (1st Cir. 1998) (quoting August v. Offices Unlimited, Inc., 981 F.2d 576, 580 (1st Cir. 1992)). Confronted with A-B's evidence that it did not know of C-O-B's contractual relationship with N.H.C.B., C-0-B's speculation and inference are insufficient to raise a trialworthy issue as to the notice element of its claim for tortious interference.

b. Wrongful Inducement of a Breach of Contract

Even if it were assumed that A-B knew of the contract between C-O-B and N.H.C.B., C-0-B cannot meet its burden with respect to the third element of its tortious interference claim, namely that A-B's alleged conduct was wrongful. An actor who "in

12

good faith" asserts "a legally protected interest" which interferes with another's contractual relationships has not acted wrongly so long as "the actor believes that his interest may otherwise be impaired or destroyed by performance of the contract . . . ." See Roberts, 138 N.H. at 540 (citing Restatement (Second) of Torts § 773). "'A trademark owner is entitled to advise others of his trademark rights . . . and to threaten accused infringers and their customers with suits.'" Golden Gulf Corp. v. Jordache Enters., 896 F. Supp. 337, 340 (S.D.N.Y. 1995) (quoting Leopold v. Siegel Co., 1987 WL 5373, at *4 (S.D.N.Y. Jan. 5, 1987); see also Letica Corp. v. Sweetheart Cup Co., Inc., 790 F.Supp. 702, 707 (E.D. Mich. 1992); Rolls-Royce Motors, Ltd. v. A & A Fiberglass, Inc., 428 F. Supp. 689, 697 (N.D. Ga. 1977).

A-B has a legally protected interest in the Budweiser and Bud trademarks which right is not in dispute here. See Rafter Decl. Ex. A (P.T.O. trademark registration certificates); see also Anheuser-Busch v. Power City Brewery, Inc., 28 F. Supp. 740, 743 (W.D.N.Y. 1939). Regardless of whether C-O-B's product actually infringes upon A-B's trademark rights, A-B has presented substantial evidence showing that it has a good-faith belief that C-O-B's product infringes on its Bud mark. See, e.g., Rafter Decl. ¶¶ 4-10. Assuming, as C-O-B suggests, that a representative of A-B called Gannon, A-B merely asserted its

13

intention to protect its legal trademark right. The conduct of a trademark holder in informing a potential infringer that it intends to protect its rights does not constitute improper interference under New Hampshire law. <u>See</u> <u>Emery v. Merrimack Valley Wood Prods., Inc.</u>, 701 F.2d 985, 988, 991 & n.5 (1st Cir. 1983) (citing Restatement (Second) of Torts § 767 & 773) (holding that employer's good faith assertion of rights under covenant not to compete does not constitute improper interference with former employee's subsequent employment relationship).[5]

C-O-B has not demonstrated a genuine issue of material fact with respect to its claim of tortious interference. Taking all reasonable inferences in favor of C-O-B, C-O-B has not met its burden of demonstrating a factual dispute as to whether A-B was aware of a contractual relationship between N.H.C.B. and C-O-B,

---

[5]Section 773 of the Restatement (Second) of Torts provides:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Restatement (Second) of Torts § 773.

14

and whether, if A-B contacted Gannon as claimed, A-B behaved improperly in asserting its trademark rights.  Therefore, A-B is entitled to summary judgment on the plaintiff's counterclaim for tortious interference.


III. New Hampshire Consumer Protection Act

C-O-B's second counterclaim asserts that A-B engaged in unfair competition in violation of the New Hampshire Consumer Protection Act, RSA 358-A.  Any person injured by another's acts or practices, which are unlawful under the Act, may seek redress. RSA 358-A:10; see also Remsburg v. Docusearch, Inc., 816 A.2d 1001, 1011 (N.H. 2003); Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 19-20 (2001).  RSA 358-A:2 provides a non-exclusive list of unlawful acts or practices covered by the Act.  See Brzica v. Trs. of Dartmouth Coll., 147 N.H. 443, 450 (2002).

C-O-B contends that A-B violated the Act by pressuring A-B distributors not to distribute Billy Budd Ale and to favor A-B products over other products.  C-O-B does not identify a listed unlawful act under RSA 358-A:2 that applies to the challenged activity.  Upon review, none of the listed acts would appear to specifically cover such activity.

In addition to the listed acts or practices, however, the Act prohibits other acts of the same type.  Roberts, 138 N.H. at

15

538. The New Hampshire Supreme Court uses the Federal Trade Commission Act ("FTC Act") for guidance in determining what other, non-listed, acts are prohibited by the Act.  Milford Lumber, 147 N.H. at 19.  Under the FTC Act, other activities are unfair or deceptive if they offend public policy as a recognized concept of unfairness, if they are "immoral, unethical, oppressive, or unscrupulous,'" or if they cause "'substantial injury to consumers (or competitors or other businessmen)."  Id. (citing FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5 (1972)).  To be actionable, "'[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'"  Barrows, 141 N.H. at 390 (quoting Levings v. Forbes & Wallace, Inc., 396 N.E.2d 149, 153 (1979)).

C-O-B argues that A-B's arrangements with its distributors are the type of unlisted, non-competitive actions which violate the intentions of the statute.  C-O-B claims that A-B's "100% Share of Mind" campaign, and the distribution agreements made pursuant to that campaign, encouraged A-B distributors to exclusively distribute A-B products and thereby interfered with C-O-B's ability to sell Billy Budd.

Even if it were assumed that the pressure tactics ascribed to A-B by C-O-B are of the type that would be unlawful under the

16

New Hampshire Consumer Protection Act, C-O-B has failed to provide any evidence that it was injured by such conduct.  A-B submitted the sworn, uncontradicted declarations of several distributors that A-B has never pressured them not to distribute Billy Budd Ale, that C-O-B never sought distribution through them, and that A-B never communicated with them about C-O-B or Billy Budd Ale.  See Clarke, Bellavance, Brown, McGinn Decls.  In addition, the record demonstrates that C-O-B never sought distribution through any A-B distributor because it preferred the brewing and distribution combination offered by N.H.C.B., which was not an A-B distributor.  See Sapuppo-Bertrand Dep. at 95, 96, 163.

In the absence of any evidence of injury to C-O-B caused by A-B's acts or practices, no trialworthy issue exists to support C-O-B's claim under the New Hampshire Consumer Protection Act. Therefore, A-B is entitled to summary judgment on the Consumer Protection Act counterclaim.

IV.  Reverse Confusion

C-O-B's third counterclaim alleges that A-B collaborated with a company called 2B's Inc. ("2B's"), in September of 1998, to mislead consumers as to the rightful proprietor of the website www.billybudd.com by means of 2B's use of the website

17

www.billybud.com. 2B's is a Virginia retail company that sells promotional A-B merchandise. C-O-B asserts that 2B's website was a deliberate attempt to make consumers believe Billy Budd or at least the website www.billybudd.com was connected to A-B.

In a claim of reverse confusion, the claimant asserts that "the public will confusedly think that the [claimant]'s product emanates in some way from the defendant. . . ." DeCosta v. Viacom Int'l, Inc., 981 F.2d 602, 607 (1st Cir. 1992). Claims of reverse confusion arise when "a less well-known senior user's goodwill and identity are overwhelmed by a more well-known junior user's use of a confusingly similar mark." Alta Vista Corp. v. Digital Equip. Corp., 44 F. Supp. 2d 72, 75 (D. Mass. 1998). Reverse confusion and ordinary confusion are considered to be essentially identical trademark claims. See DeCosta, 981 F.2d at 608; Alta Vista Corp., 44 F. Supp. 2d at 76. To succeed on this claim C-O-B must show "1) that [it] uses, and thereby 'owns,' a mark, 2) that [A-B has used] that same or a similar mark, and 3) that [A-B's] use is likely to confuse the public, thereby harming [C-O-B]." See DeCosta, 981 F.2d at 605.

In 1992, 2B's opened a retail store in Virginia Beach, Virginia. Turner Decl. ¶ 6. In or around June of 1996, 2B's started a website at www.budbill.com. Id. The owner of 2B's, William Turner, claims that he chose the site www.budbill.com

18

because his nickname is Bill and 2B's sold Budweiser products. Turner Decl. ¶ 7. In 1998, 2B's failed to re-register the domain name www.budbill.com and instead registered www.billybud.com.

The court need not resolve the question of whether C-O-B is entitled to any common law trademark protection in Billy Budd or the website www.billybudd.com because C-O-B has not met its burden with respect to whether A-B ever used the marks C-O-B claims to own. 2B's is an independent reseller of A-B promotional products and is owned and operated by Turner who also worked as a route supervisor for M. Price Distributing, Inc., a distributor of A-B products in Virginia. C-O-B has not impled Turner, 2B's, or M. Price Distributing on its counterclaims. C-0-B has offered no evidence, nor even alleged that Turner, 2B's or M. Price Distributing is an agent of A-B.

A-B denies C-O-B's claim that it had any communication with 2B's about the domain name www.billybud.com. The record indicates that A-B regularly monitored a different website maintained by 2B's, Inc., www.budbill.com. See Def.'s Ex. 13. C-0-B's assertion that A-B must have known about Turner's www.billybud.com website rests on pure speculation and is insufficient to create a genuine issue of material fact as to any efforts by A-B to confuse consumers about C.O.B.'s website or products. Therefore, because C-O-B has failed to demonstrate the

19

existence of a material factual issue as to A-B's use of the marks in which C-O-B asserts trademark rights, A-B is entitled to summary judgment on C-O-B's claim for reverse confusion.

<u>Conclusion</u>

For the foregoing reasons, the plaintiff's motion for summary judgment as to the defendant's counterclaims (document no. 41) is granted. The court declines to award attorneys' fees and costs to A-B for its efforts in defending these counterclaims.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

July 22, 2003

cc:  Arpiar G. Saunders Jr., Esquire
     Michael W. Rafter, Esquire
     George L. Little Jr., Esquire
     Brian S. Withers, Esquire
     Robert A. Shaines, Esquire
     Peter Bennett, Esquire