# United States Court of Appeals
## For the First Circuit

No. 10-2094

WILLIAM FOOTE,

Plaintiff, Appellant,

v.

TOWN OF BEDFORD ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Mark A. Stull for appellant.
Charles P. Bauer, with whom Beth A. Deragon and Gallagher, Callahan & Gartrell, P.C. were on brief, for appellee Town of Bedford.
Brian J.S. Cullen, with whom CullenCollimore PLLC was on brief, for individual appellees.

April 21, 2011

---

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, <u>Circuit Judge</u>.   A town council refused to reappoint the plaintiff to an unpaid advisory commission after he publicly criticized certain of the council's policies.   The plaintiff sued, but the district court jettisoned his case at the summary judgment stage.  <u>Foote</u> v. <u>Town of Bedford</u>, No. 1:09-cv-171, 2010 WL 3238315 (D.N.H. Aug. 13, 2010).   The plaintiff's appeal presents a nuanced First Amendment question about the relationship between policymakers and policy-related speech in the public sector.   After careful consideration, we conclude that the refused reappointment, though premised on a lawful exercise of the plaintiff's right to free speech, did not transgress the First Amendment.   Consequently, we affirm the judgment below.

## I.   BACKGROUND

We draw the facts from the summary judgment record and rehearse them in the light most favorable to the nonmovant (here, the plaintiff).  <u>Galloza</u> v. <u>Foy</u>, 389 F.3d 26, 28 (1st Cir. 2004).

The organic governing document of Bedford, New Hampshire (the Town), is the town charter, which vests primary responsibility for the administration of municipal affairs in a seven-member town council (the Council).   The charter imbues the Council with authority to appoint the members of municipal boards and commissions, including the Bedford Recreation Commission (the Commission).   The Commission's bailiwick is to propound recommendations to the Council and the Town Manager about "the

-2-

acquisition, holding, and disposition" of recreational facilities, the staffing of those facilities, and the "rules and regulations" for their operation. Bedford, N.H., Charter art. 1-11-1(c)(2).

The Commission holds regular meetings that are open to the public. It is composed of five members, all of whom serve without compensation. They are appointed by the Council, typically for staggered three-year terms (although some appointments are for shorter periods, say, if a commissioner dies or resigns mid-term).

On May 11, 2005, the Council appointed plaintiff-appellant William Foote to fill a vacancy in the Commission's ranks. Upon completing the unexpired portion of that term, he was reappointed for three years. For aught that appears, his service was exemplary.

In January of 2009, the plaintiff received a letter reminding him that his term would expire in March and inquiring about whether he wished to continue. The letter made pellucid that reappointment would be in the Council's sole discretion. The plaintiff replied that he would be pleased to return to the Commission.

On March 6, the plaintiff attended a meeting of a committee formed to assist in developing a community park project denominated as Bedford Village Common (BVC). At the meeting, he voiced opposition to the Council's plan to revise certain aspects of the proposed project and (over the Council's objections)

advocated the use of impact fees as a funding mechanism to assure financial viability. In a particularly pointed exchange, he accused the Council of "trying to kill the project with a thousand paper cuts."

A municipal election took place on March 10. The plaintiff lost a bid for a seat on the school board. In defeat, he warned that he would be watching how the school board handled its budget.

With the election in his rear-view mirror, the plaintiff continued to press his candidacy for reappointment to the Commission. To that end, he met with members of the newly constituted Council. At a meeting held on March 16, the Council, voting four to three, proposed filling the two vacancies on the Commission with other aspirants. In a later vote, the Council named those aspirants to the Commission.

Asserting that his vocal criticism in connection with the BVC project led to this rebuff, the plaintiff sued the Town and four councillors who had voted to deny him reappointment (William Dermody, Michael Izbicki, Paul F. Roy, Sr., and Robert Young). He brought his suit in a New Hampshire state court, alleging a First Amendment claim under 42 U.S.C. § 1983 and three supplemental state-law claims. The defendants removed the case to federal district court, see 28 U.S.C. §§ 1331, 1441(b), 1446, and in due

season sought summary judgment, see Fed. R. Civ. P. 56.  The plaintiff opposed summary judgment.

The district court entered summary judgment on the section 1983 claim and remanded the remaining claims to state court.  Foote, 2010 WL 3238315, at *4-5.  It reasoned that the defendants' "strong interest" in appointing like-minded people to the Commission outweighed the plaintiff's First Amendment rights.  Id. at *4.  This timely appeal followed.

## II.  DISCUSSION

We divide our substantive discussion into four segments.

### A.  Standard of Review.

We review the entry of summary judgment de novo.  Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  In performing this tamisage, we scrutinize the facts in the light most agreeable to the nonmovant, ceding all reasonable inferences therefrom in his favor.  Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004).  Summary judgment is appropriate only if the record, viewed in the required light, reveals no genuine issue of material fact and demonstrates that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Withal, we are not married to the trial court's rationale but may uphold its ruling on any ground made manifest by the record.  Houlton Citizens' Coal., 175 F.3d at 184; Garside v. Osco Drug, Inc., 895 F.2d 46, 48-49 (1st Cir. 1990).

-5-

### B.  **The Decisional Framework**.

The plaintiff's case stands or falls on his claim that the individual defendants impermissibly refused to reappoint him to the Commission because of his public opposition to, and criticism of, certain municipal policies.  For summary judgment purposes, the district court assumed that this reason underpinned his failed bid for reappointment, and so do we.  This assumption is important because "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."[1]  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  As this case illustrates, that right is not absolute.

When speech by a public employee is involved, courts typically choreograph a three-step chaconne.  The first step is to determine whether the employee spoke as a citizen on a matter of public concern.  Id. at 415-16.  The second step is to balance the employee's First Amendment interests against the interests of the government, as an employer, in providing effective and efficient services.  Waters v. Churchill, 511 U.S. 661, 668 (1994).  At the third and final step, the employee must "show that the protected expression was a substantial or motivating factor in the adverse

---

[1] Of course, the plaintiff was an unpaid member of an advisory board rather than a full-fledged employee, and he was denied reappointment rather than discharged.  We explain infra why we nonetheless consider the dismissed-employee analogy apt.

-6-

employment decision." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007).

For present purposes, the defendants do not dispute that the plaintiff spoke out as a citizen and that his public commentary related to matters of community concern. Thus, his speech triggers First Amendment analysis. See Connick v. Myers, 461 U.S. 138, 146 (1983). The third step here is a foregone conclusion; we already have noted our assumption that the commentary was a substantial cause of the Council's refusal to reappoint the plaintiff to a new term on the Commission. It necessarily follows that this appeal hinges on the second step in the chaconne: the "balance between the interests of the [plaintiff], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).

The Pickering balancing test is heavily dependent on context, and the Supreme Court has established a corollary to this test with respect to policymaking employees. The seminal case is Elrod v. Burns, 427 U.S. 347 (1976), in which the Court held that a government employer cannot discharge an employee merely because he is not affiliated with a particular political party. Id. at 373 (plurality op.). But the Court noted an exception: a government employer can terminate a policymaking employee based on party

-7-

affiliation. Id. at 367. "This exception helps to ensure that elected representatives will not be hamstrung in endeavoring to carry out the voters' mandate." Galloza, 389 F.3d at 28.

The Court later broadened the exception to include any employee for whom "party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507, 518 (1980). Thus, when a government employer takes an adverse employment action against such a policymaking employee based on the latter's political affiliation, it has "demonstrate[d] a compelling interest in infringing First Amendment rights." Rutan v. Repub. Party of Ill., 497 U.S. 62, 71 n.5 (1990).

The Supreme Court has not squarely addressed the question of whether, or how, the Elrod/Branti exception applies to a policymaking employee's First Amendment claim premised on speech rather than political affiliation. Nevertheless, a number of courts of appeals have concluded that the principles undergirding the Elrod/Branti exception provide roughly comparable shelter for a government employer where a policymaker is cashiered for policy-related speech. See, e.g., Rose v. Stephens, 291 F.3d 917, 921 (6th Cir. 2002); Warzon v. Drew, 60 F.3d 1234, 1238 (7th Cir. 1995); Hall v. Ford, 856 F.2d 255, 263 (D.C. Cir. 1988). These courts sensibly "recognize[] the inherent inconsistency in a rule that protects a policymaking employee who overtly expresses his

disloyalty while denying that same protection to one who merely belongs to a different political party." Rose, 291 F.3d at 922; accord Vargas-Harrison v. Racine Unified Sch. Dist., 272 F.3d 964, 971-72 (7th Cir. 2001). Although acknowledging that the Pickering balance must still be struck, these courts employ Elrod/Branti principles to inform that exercise. See Vargas-Harrison, 272 F.3d at 971. In public employee/public speech cases involving policymakers, those principles ordinarily will tip the balance in favor of the government as a matter of law.[2] See Rose, 291 F.3d at 922; Vargas-Harrison, 272 F.3d at 971.

The key precedent in this circuit fits tongue and groove with this case law. See Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir. 1998). That decision involved a challenge to the dismissal of two policymaking employees on both free speech and free association grounds. In ruling for the employer, we wrote:

> it is a reasonable working rule that, where the employee is subject to discharge for political reasons under the Elrod and Branti cases, a superior may also — without offending the First Amendment's free speech guarantee — consider the official's substantive views on agency matters in deciding whether to retain the official in a policy related position.

---

[2] One circuit has gone even further, ruling that the Elrod/Branti exception for policymakers replaces Pickering in policymaker cases involving policy-related speech. See Fazio v. City and Cnty. of San Francisco, 125 F.3d 1328, 1332 (9th Cir. 1997). Under that view, a determination that the employee is a policymaker "dispos[es] of any First Amendment retaliation claim." Biggs v. Best, Best & Krieger, 189 F.3d 989, 994-95 (9th Cir. 1999). We hesitate to go so far.

Id. "Precisely because [the plaintiffs'] speech did bear on the job and on their working relationship," the employer "was permitted to conclude reasonably that she did not have the necessary trust and confidence to retain them." Id. (internal quotation marks omitted).

We think that this approach follows logically from the Supreme Court's repeated admonition in the political affiliation cases that the government must be allowed to accomplish its policy objectives through loyal, cooperative deputies whom the public will perceive as sharing the administration's goals. See Rutan, 497 U.S. at 74; Rankin v. McPherson, 483 U.S. 378, 388 (1987). In the political affiliation cases, the Court made a "[c]ategorical judgment[] based on experience and common sense" that an "elected official is entitled to insist on the loyalty of his policymaking subordinates." Wilbur v. Mahan, 3 F.3d 214, 218 (7th Cir. 1993). The same commonsense tenets are in play when a policymaker, by espousing contrary views, openly undermines the appointing authority's interest in ensuring that its policies will be implemented. See Vargas-Harrison, 272 F.3d at 971. "[D]isagreement between the employer and the policymaking employee over job-related policy issues causes the same failure of loyalty and shared political mission between superior and subordinate as inconsistent political affiliation or viewpoint." Bonds v. Milwaukee Cnty., 207 F.3d 969, 978 (7th Cir. 2000).

We add that transplantation of <u>Elrod</u>/<u>Branti</u> principles to speech cases is consistent with <u>Pickering</u>'s goal of balancing the government's interest in effective governance with the employee's right to speak out on matters of public concern.  <u>See</u> <u>Pickering</u>, 391 U.S. at 568.  The <u>Pickering</u> Court recognized the "significantly different considerations" that attend the dismissal of an employee in circumstances in which loyalty is essential.  <u>Id.</u> at 570 n.3; <u>see</u> <u>Rankin</u>, 483 U.S. at 388.  In a case involving policy-related speech, like this one, those considerations ought to weigh heavily in the <u>Pickering</u> balance.[3]

What we have said to this point dictates the decisional framework that applies here.  The <u>Elrod</u>/<u>Branti</u> line of cases must inform the <u>Pickering</u> balance whenever a policymaking employee is dismissed for speech elucidating his views on job-related public policy.

### C. **Distinguishing Characteristics**.

Thus far, our analysis has focused on the First Amendment rights of policymakers ousted from public employment due to

---

[3] We recognize that some courts have thus far confined the application of <u>Elrod</u> and <u>Branti</u> to cases involving political affiliation.  <u>See</u>, <u>e.g.</u>, <u>Hinshaw</u> v. <u>Smith</u>, 436 F.3d 997, 1006 (8th Cir. 2006); <u>Curinga</u> v. <u>City of Clairton</u>, 357 F.3d 305, 314 (3d Cir. 2004); <u>Lewis</u> v. <u>Cowen</u>, 165 F.3d 154, 162 (2d Cir. 1999).  But the distinction, if one exists, is a matter of degree; those courts freely acknowledge that when the affected employee holds a policymaking position, the government's interest weighs quite heavily in the <u>Pickering</u> balance.  <u>See</u> <u>Hinshaw</u>, 436 F.3d at 1007; <u>McEvoy</u> v. <u>Spencer</u>, 124 F.3d 92, 103 (2d Cir. 1997).

political affiliation and/or speech. The plaintiff does not fit that mold precisely. For one thing, he was not a government employee but, rather, a volunteer. For another thing, he was not fired but, rather, denied reappointment. In the circumstances of this case, however, neither of those distinctions inhibits the applicability of either Pickering or Elrod/Branti principles. We explain briefly.

Although some courts have ruled that volunteers hold their unpaid government positions in the unfettered discretion of the appointing authority, see, e.g., Griffith v. Lanier, 521 F.3d 398, 404 (D.C. Cir. 2008); Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993), we need not solve that riddle. For present purposes, it is enough to say that the government's interest in ensuring that its policymakers sing from the same sheet music applies equally to policymakers who are hired hands and policymakers who are unpaid advisors.

By like token, the fact that the plaintiff was denied reappointment, rather than dismissed, does not alter the relevant calculus. See Barton v. Clancy, 632 F.3d 9, 26 (1st Cir. 2011); Ward v. Hickey, 996 F.2d 448, 452 (1st Cir. 1993). Where, as here, the adverse action involves the denial of an appointment to an unpaid advisory post that deals with policy matters, the government's interest in effective and efficient operation is on a par with its interest when the action involves the removal of an

employee from a paid policymaking position.  See Barton, 632 F.3d at 26.

### D.  **The Merits**.

Having determined that the principles underpinning the Elrod/Branti exception are transferable to public employee/public speech cases, we turn to whether the position that the plaintiff sought was policymaking in nature and, if so, whether the speech that prompted the denial of reappointment was policy related.  See Rose, 291 F.3d at 924; Warzon, 60 F.3d at 1239.  These are quintessentially legal questions.  See Flynn, 140 F.3d at 44.

This inquiry is both position-specific and speech-specific.  See Bonds, 207 F.3d at 977-78; see also Galloza, 389 F.3d at 29.  First, we examine position-specific features starting with a "high-level glimpse" at whether the particular position deals with matters that are potentially subject to differences of opinion on policy grounds.  Galloza, 389 F.3d at 29.  This assessment encompasses the extent to which the position has the capacity to "influence[] the resolution of such matters."  Mendez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1258 (1st Cir. 1987).

We need not tarry.  The Commission is obviously a policymaking body.  Its principal function is to advise the Council, which is the Town's legislative and policymaking arm.  See N.H. Rev. Stat. Ann. § 49-B:2(IV)(d); Town of Hooksett v. Baines, 813 A.2d 474, 475-76 (N.H. 2002).  State law and the town charter

-13-

confer upon the Commission broad duties relating to the formulation and implementation of park policy and the responsibility to work with other governmental actors to coordinate and promote recreational activities. N.H. Rev. Stat. Ann. § 35-B:3; Bedford, N.H., Charter art. 1-11-1(c). The Commission's responsibilities call for the exercise of discretionary judgment on matters of importance to the Town and its inhabitants and involve policy issues on which there is room for disagreement as to both goals and methods of implementation. See Jimenez Fuentes v. Torres Gaztambide, 807 F.2d 236, 241-42 (1st Cir. 1986) (en banc). That these responsibilities are exercised subject to Council approval does not alter their fundamental character.

The second element of this position-specific assessment focuses on whether the responsibilities of the position itself "sufficiently resemble those of a policymaker." Galloza, 389 F.3d at 29. An important datum is whether the ability to do the work effectively will be enhanced by the appointment of persons who hold particular policy views. An office-holder who is principally involved with policy, "even if only as an adviser," qualifies as a policymaker. Flynn, 140 F.3d at 46.

The position in question fits neatly within this paradigm. Although there is no formal job description for the position, the Commission's raison d'être involves policymaking, and members of the Commission are the instruments for carrying out that

-14-

mission. Individual Commission members work directly with elected officials and have a considerable capacity to influence municipal decisions affecting parks and recreation. They are, therefore, policymakers. See Vargas-Harrison, 272 F.3d at 971; Ortiz-Piñero v. Rivera-Arroyo, 84 F.3d 7, 14 (1st Cir. 1996).

The plaintiff suggests that because the position is merely advisory, it cannot involve policymaking. This suggestion sets up a false dichotomy. A person need not possess the ultimate decisionmaking authority in order to qualify as a policymaker. Advisors can be policymakers. See Elrod, 427 U.S. at 368; Flynn, 140 F.3d at 46.

The last piece of the puzzle is speech-specific. We ask whether the speech in question fairly can be said to conflict with the appointing authority's stated policies on matters related to the Commission's work. See Rose, 291 F.3d at 924; Vargas-Harrison, 272 F.3d at 973. This aspect of the matter is open and shut.

In the weeks before the Council took the challenged action, the plaintiff made it crystal clear (openly and vociferously) that he disagreed with the Council's approach to the BVC project. In addition, he publicly opposed the Council's choice of a preferred funding mechanism for the project. These views are plainly policy related and bear directly on matters that the Council reasonably could expect to fall within the purview of the

Commission.  On the undisputed facts, the necessary link between the speech and the position has been forged.[4]

In an effort to change the trajectory of the debate, the plaintiff argues that diversity of viewpoints among Commission members is beneficial to enlightened governance.  That may be true, but the choice is up to the Council.  The First Amendment does not require that an appointing authority surround itself with policymakers who represent divergent viewpoints.  See Wilbur, 3 F.3d at 218; see also Connick, 461 U.S. at 146 ("[G]overnment officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.").

In this case, all roads lead to Rome.  A position-specific assessment makes manifest that compatibility of views is a reasonable requirement for appointment to the Commission.  A speech-specific assessment makes manifest that the plaintiff's comments on matters within the purview of the Commission could reasonably have been seen by the defendants as demonstrating a lack of the desired compatibility.  Under these circumstances,

---

[4] The plaintiff also alleges that his animadversions against the school board contributed to the refusal to reappoint him to the Commission.  This allegation adds nothing to the equation.  After all, the Council reasonably could have regarded those comments as interfering with his ability to carry out one of the essential functions of the Commission: coordinating park policy with other public officials.  See N.H. Rev. Stat. Ann. § 35-B:3; Bedford, N.H., Charter art. 1-11-1(c).

Elrod/Branti principles require a finding that the defendants' interest in providing effective and efficient government preponderates over the plaintiff's First Amendment interest in free expression of his views. See O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 719 (1996); Bonds, 207 F.3d at 977. Consequently, the Pickering balance must be struck in favor of permitting the defendants to rely on the plaintiff's public comments as a reason for declining to reappoint him to the Commission. See Vargas-Harrison, 272 F.3d at 974.

## III. CONCLUSION

We need go no further. While the plaintiff was within his rights to criticize the Council's vision of the BVC project, the defendants were likewise within their rights in choosing not to reappoint a foe of their policies to serve on a board whose primary function was to give them policymaking advice. Thus, the district court did not err in rejecting the plaintiff's First Amendment claim.

**Affirmed**.