# United States Court of Appeals
## For the First Circuit

No. 11-1576

GAIL JONES, IN HER CAPACITY AS EXECUTRIX
OF THE ESTATE OF GARY JONES,

Plaintiff, Appellant,

v.

LAWRENCE SECORD,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Howard, Selya and Thompson,
Circuit Judges.

Roberto Tepichin, with whom Michael R. Perry, Ryan E. Ferch and Murphy & King, were on brief, for appellant.
Anthony M. Campo, with whom Mark W. Shaughnessy, Andrew B. Ranks and Boyle, Shaughnessy & Campo, P.C., were on brief, for appellee.

July 6, 2012

**SELYA, Circuit Judge.** This case arises out of the tragic death of the plaintiff's decedent, Gary Jones, who was shot and killed by a man wielding a stolen handgun. In her federal court complaint, the plaintiff claimed that the gun owner's negligent storage of the weapon and his failure timely to report its theft proximately caused the decedent's death. The district court rejected these claims and granted summary judgment in favor of the gun owner. Jones v. Secord, No. 10-146, 2011 WL 1557883 (D.N.H. Apr. 26, 2011). The plaintiff appeals. We affirm.

## I. BACKGROUND

We summarize the relevant facts in the light most favorable to the party opposing summary judgment (here, the plaintiff). See Foote v. Town of Bedford, 642 F.3d 80, 81 (1st Cir. 2011).

For the last thirty years, the defendant, Lawrence Secord, has owned a hunting camp in Wentworth Location, New Hampshire. The camp is used as a base for hunting and fishing, and the defendant has routinely made it available to family members.

The camp includes a cabin that is thirty-eight feet long by sixteen feet wide. The cabin is normally locked when unoccupied — but a key is hidden on the property and family members know of its whereabouts.

The defendant kept a revolver hidden under the base of a water-heater platform inside the cabin. The record is empty as to

-2-

whether family members were aware of this hiding place, but the ammunition for the handgun was stored in plain sight.

Until he was seventeen years old, the defendant's grandson, Michael Woodbury, was among the family members who regularly visited the camp. He would go there to hunt and fish with his grandfather and his father. These visits ceased abruptly around June of 1994, when Woodbury offended his grandfather by cancelling a planned fishing trip. From that time forward, Woodbury was not welcome at the camp and, for aught that appears, did not go there.

Soon after his banishment, Woodbury committed a series of felonies (including bank robbery and breaking and entering) that resulted in his incarceration. By May of 2007, he was out of prison and had been helping his father build a house in Sebago, Maine. At that point, he had not spoken to the defendant for approximately ten years. He nonetheless showed up that month unannounced at the defendant's principal residence in Scarborough, Maine. The defendant received him coldly, and Woodbury departed minutes after his arrival. That was the last that the defendant saw Woodbury until after the plaintiff's decedent was murdered.

Toward the end of June in 2007, the defendant's son, who had recently visited the hunting camp, told the defendant that he had accidentally left a mousetrap outside of the cabin. On June 28, the defendant asked a friend, Sarah Barton, to go to the camp,

-3-

and she went there that night.  Nobody was around, but sheets were draped over the windows and a radio was playing.  According to Barton, she peered through a window, spied what she thought was the wayward mousetrap, and departed.[1]

Barton did not immediately report what she had seen to the defendant because she assumed that the defendant's son had left the camp hurriedly and she did not want to cause trouble.  She returned to the camp the next day.  This time she entered the cabin through a door that was locked but not properly shut, turned off the radio, and retreated.  The interior of the cabin appeared to be clean and in good order.

At a family gathering in Scarborough on July 1, 2007, Barton told the defendant about the sheets on the windows of the cabin.  The defendant called his son's girlfriend, who disavowed any knowledge of the situation.  The defendant and Barton were entertaining out-of-town guests and did not go to the camp until July 3.

When they arrived, they found that the cabin had been trashed, a rear window had been broken, and an unknown intruder had strewn garbage and debris throughout the cabin.  They cleaned up the mess and left without calling the authorities.

---

[1] A slightly different account of Barton's visit appears in a subsequent police report and in the police officer's deposition. The disparities, where relevant, are discussed below.

-4-

After arriving home, the defendant learned that his estranged grandson, Woodbury, had been accused of murdering three people during a robbery on July 2. It subsequently became clear that Woodbury had been the intruder who broke into the cabin, that he had found and taken the hidden revolver, and that he had used the revolver to commit the murders.

In due course, the plaintiff, in her capacity as the executrix of the estate of Gary Jones (one of the murder victims), brought suit against the defendant in the United States District Court for the District of New Hampshire. She invoked diversity jurisdiction based upon the defendant's Maine citizenship, her decedent's Massachusetts citizenship, and an amount in controversy exceeding $75,000. See 28 U.S.C. §§ 1332(a), 1332(c)(2); see also Quincy V, LLC v. Herman, 652 F.3d 116, 120 (1st Cir. 2011) (explaining that for diversity purposes, the citizenship of a decedent is imputed to his personal representative).

In her complaint, the plaintiff alleged that the defendant was negligent in failing both adequately to secure the revolver and promptly to report its theft. After a ten-month period of pretrial discovery, the district court granted summary judgment in favor of the defendant. See Jones, 2011 WL 1557883, at *1-2. The court concluded that no liability attached for a failure to secure the revolver because no legally cognizable duty was owed; under New Hampshire law, "individuals ordinarily are not subjected

to liability for the criminal acts of third parties." Id. at *1. The court rejected the plaintiff's failure-to-report claim on the basis of what the court characterized as an undisputed factual record. See id. at *1 & n.2. This timely appeal followed.

## II. ANALYSIS

A trial court's entry of summary judgment engenders de novo appellate review. See Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 30 (1st Cir. 2012). The court of appeals, like the trial court, must take the facts in the light most congenial to the nonmoving party, resolve any evidentiary conflicts in that party's favor, and draw all reasonable inferences to her behoof. Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 396 (1st Cir. 2012). The court of appeals is not limited to the district court's rationale, but may affirm on any independent ground made manifest by the record. González-Droz v. González-Colón, 660 F.3d 1, 9 (1st Cir. 2011).

Before us, the plaintiff advances both procedural and substantive arguments. We group the arguments under those headings and address them sequentially.

### A. Procedural Arguments.

To place the plaintiff's procedural arguments into perspective, we rehearse the travel of the case. The plaintiff sued on April 19, 2010, the defendant answered the complaint, and the district court entered a scheduling order on June 22, 2010.

See Fed. R. Civ. P. 16(b). This order set a deadline of April 1, 2011, for both the completion of discovery and the filing of any remaining dispositive motions.

On March 1, 2011, the defendant moved for summary judgment. Three days later, the United States District Court for the District of Massachusetts, acting at the behest of the plaintiff, directed a subpoena to a non-party, Hanover Insurance Group. See Fed. R. Civ. P. 45(a)(2)(C). This subpoena required Hanover to produce certain statements made by the defendant to it. In particular, the subpoena sought statements indicating when the defendant became aware of the theft of the handgun. In support, plaintiff's counsel represented that a Hanover claims adjuster had previously informed him that the defendant learned of the theft on June 30, 2007.

Both the defendant and Hanover asked the New Hampshire federal district court to quash the subpoena. The plaintiff responded on March 31, 2011, arguing that the court below lacked authority to quash the subpoena because a different district court had issued it. The plaintiff filed her opposition to the summary judgment motion that same day.

On April 22, 2011, the district court referred the discovery dispute to a magistrate judge. See 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). Four days later, the court, without entertaining oral argument, granted the pending motion for

-7-

summary judgment.  Jones, 2011 WL 1557883, at *1-2.  At that juncture, the magistrate judge had taken no action on the discovery dispute, and the subpoenaed documents had not been produced.

**1. The Unadjudicated Discovery Dispute.**  The plaintiff's chief procedural argument posits that the district court abused its discretion when it decided the summary judgment motion while the discovery dispute was outstanding.  This argument, however, overlooks the provisions of Federal Rule of Civil Procedure 56(d).[2]

Rule 56(d) provides in pertinent part that if a party opposing summary judgment shows "that, for specified reasons, it cannot present facts essential to justify its opposition," the court may grant appropriate relief.  In short, Rule 56(d) affords a safety net for parties that need more time to gather facts essential to resist a motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (explaining that "[a]ny potential problem with [a] premature [motion for summary judgment] can be adequately dealt with under [this rule]"); Rivera-Torres v. Rey-Hernández, 502 F.3d 7, 10 (1st Cir. 2007) (similar).  This safeguard, when properly invoked, serves as a way of ensuring that judges will not "swing[] the summary judgment axe too hastily."

---

[2] Rule 56(d) was formerly Rule 56(f).  This change in nomenclature is unimportant; the textual differences between current Rule 56(d) and former Rule 56(f) are purely stylistic. See Fed. R. Civ. P. 56 advisory committee's note; see also Godin v. Schencks, 629 F.3d 79, 90 n.19 (1st Cir. 2010). Consequently, the case law developed under the earlier version remains authoritative, and we refer to it where applicable.

Rivera-Torres, 502 F.3d at 10 (quoting Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994) (internal quotation marks omitted)).

But courts, like the deity, tend to help those who help themselves, and Rule 56(d) is not self-executing. A party must invoke it. Here, however, the plaintiff did not invoke Rule 56(d). To compound this error, she made no mention of the outstanding discovery dispute in her opposition to the motion for summary judgment; nor did she advise the court, when it referred the discovery dispute to the magistrate judge, that it might have a bearing on the pending summary judgment motion.

The plaintiff tries to shift the blame by insisting that the court knew of the outstanding discovery dispute because of the motion to quash and, thus, there was no point in filing a Rule 56(d) affidavit. This rhetoric turns the matter upside down. Federal district courts are busy places, and judges often have crowded dockets. It is not the court's responsibility to dig through the record in a particular case unsolicited and determine whether some timing problem might exist in connection with a summary judgment motion. Rather, Rule 56(d) places that responsibility squarely on the shoulders of the party opposing the motion. See Mir-Yépez v. Banco Popular de P.R., 560 F.3d 14, 15-16 (1st Cir. 2009); N. Bridge Assocs., 22 F.3d at 1203. Asserting, as the plaintiff does, that a district court abuses its discretion by

not engaging sua sponte in an independent review of the docket is the functional equivalent of expecting the court to do the lawyer's job.

The protocol that we have approved in connection with Rule 56(d) recognizes this division of responsibility. A party opposing summary judgment who wishes to invoke Rule 56(d) must act diligently and proffer to the trial court an affidavit or other authoritative submission that "(i) explains his or her current inability to adduce the facts essential to filing an opposition, (ii) provides a plausible basis for believing that the sought-after facts can be assembled within a reasonable time, and (iii) indicates how those facts would influence the outcome of the pending summary judgment motion." Vélez v. Awning Windows, Inc., 375 F.3d 35, 40 (1st Cir. 2004).

The plaintiff made no effort at all to satisfy these requirements while the summary judgment motion was pending. Her present objection is, therefore, untenable. See, e.g., United States v. San Juan Bay Marina, 239 F.3d 400, 408 (1st Cir. 2001); Meehan v. Town of Plymouth, 167 F.3d 85, 92 n.7 (1st Cir. 1999); Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 678-79 (1st Cir. 1996).

**2. Absence of Oral Argument.** The plaintiff's fallback position is that the district court abused its discretion by deciding the summary judgment motion without oral argument. This

-10-

suggestion is jejune.  First and foremost, the plaintiff did not request oral argument in the district court — and that is the end of the matter.  See D.N.H.R. 7.1(d) ("[A] court shall decide motions without oral argument . . . [and] may allow oral argument after consideration of a written statement by a party outlining the reasons why oral argument may provide assistance to the court."); see also United States v. One 1974 Porsche 911-S Vehicle Identification No. 9114102550, 682 F.2d 283, 286-87 (1st Cir. 1982).  With such a local rule in place, a district court has no sua sponte obligation to convene oral argument on a motion.

If more were needed — and we do not think that it is — "district courts have considerable discretion in deciding whether or not to allow oral argument on a dispositive motion."  Domegan v. Fair, 859 F.2d 1059, 1065 (1st Cir. 1988).  "Absent a showing of serious prejudice, it is not an abuse of discretion to deny oral argument on a summary judgment motion."  Bratt v. Int'l Bus. Machs. Corp., 785 F.2d 352, 363 (1st Cir. 1986).  We discern no serious prejudice here.

## B. **Substantive Arguments.**

The parties agree that, in this diversity action, New Hampshire substantive law controls.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938); see also Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (explaining that "a federal court sitting in diversity is free, if it chooses, to forgo independent

-11-

[choice-of-law] analysis and accept the parties' [reasonable] agreement" about which state law controls). Under New Hampshire law, a successful negligence claim requires a showing of duty, breach, proximate cause, and injury. See Vachon v. New England Towing, Inc., 809 A.2d 771, 774 (N.H. 2002). Determining whether a legally cognizable duty exists demands a case-specific inquiry into whether the defendant could reasonably foresee that his conduct could cause an injury. See Walls v. Oxford Mgmt. Co., 633 A.2d 103, 105 (N.H. 1993). It follows that "[d]uty and foreseeability are inextricably bound together." Corso v. Merrill, 406 A.2d 300, 303 (N.H. 1979). "Whether a defendant's conduct creates a sufficiently foreseeable risk of harm to others sufficient to charge the defendant with a duty to avoid such conduct is a question of law." Macie v. Helms, 934 A.2d 562, 565 (N.H. 2007) (internal quotation marks omitted).

New Hampshire adheres to the general rule that "a private citizen has no [] duty to protect others from the criminal attacks of third parties." Dupont v. Aavid Thermal Techs., Inc., 798 A.2d 587, 590 (N.H. 2002); accord Ahrendt v. Granite Bank, 740 A.2d 1058, 1063 (N.H. 1999); Walls, 633 A.2d at 104. "This rule is grounded in the fundamental unfairness of holding private citizens responsible for the unanticipated criminal acts of third parties, because under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably

-12-

proceed upon the assumption that others will obey the law." Remsburg v. Docusearch, Inc., 816 A.2d 1001, 1006 (N.H. 2003) (alteration and internal quotation marks omitted); see Walls, 633 A.2d at 105 ("Although crimes do occur[,] they are still so unlikely that the burden of taking continual precautions against them almost always exceeds the apparent risk." (alterations and internal quotation marks omitted)).

The New Hampshire Supreme Court has identified three narrow exceptions to the general rule that citizens have no duty at common law to protect others from criminal acts of third parties. See, e.g., Berry v. Watchtower Bible & Tract Soc'y. of N.Y., Inc., 879 A.2d 1124, 1128 (N.H. 2005); Remsburg, 816 A.2d at 1007; Dupont, 798 A.2d at 590. These exceptions apply to situations in which "(1) a special relationship exists; (2) special circumstances exist; or (3) the duty has been voluntarily assumed."[3] Remsburg, 816 A.2d at 1007. Ascertaining whether an exception applies is a matter of law. See, e.g., Ward v. Inishmaan Assocs. Ltd., 931 A.2d 1235, 1237-38 (N.H. 2007); Marquay v. Eno, 662 A.2d 272, 278-80 (N.H. 1995).

---

[3] The New Hampshire Supreme Court sometimes has ruminated about a fourth possible exception: overriding foreseeability. Walls, 633 A.2d at 106; see Ward v. Inishmaan Assocs. Ltd., 931 A.2d 1235, 1237-38 (N.H. 2007). The court, however, squarely rejected this possible exception in the landlord-tenant context. See Ward, 931 A.2d at 1237-38; Walls, 633 A.2d at 107. Because the plaintiff does not draw out this distinction and our discussion of the "special circumstances" exception adequately deals with any overriding foreseeability argument, we need not elaborate upon it.

The plaintiff trains her sights on the special circumstances exception. This exception applies "where there is an especial temptation and opportunity for criminal misconduct brought about by the defendant[,]" Remsburg, 816 A.2d at 1007 (internal quotation marks omitted), such as when "the defendant's conduct has created an unreasonable risk of criminal misconduct." Id. The plaintiff attempts to bring her case within the exception in two ways. First, she focuses on the defendant's ostensible failure to report the theft of the revolver in a timely fashion. Second, she focuses on the defendant's ostensible failure to secure the revolver properly. Both of these arguments contemplate that the defendant knew of Woodbury's presence near the camp.

**1. Failure to Report.** The plaintiff contends that the defendant could have prevented the murder by seasonably reporting the theft of his handgun. As an initial matter, the defendant counters that he did not know about the theft until after the murder occurred. The plaintiff disagrees; she says that there is a genuine issue of material fact as to when the defendant learned of the theft.

The defendant testified that he did not realize the revolver had been stolen until after the murder (which occurred on July 2, 2007). To rebut this testimony, the plaintiff relies on a police report. She avers that the report, prepared by Trooper

-14-

West, contradicts the defendant's testimony. We dissect the anatomy of this averment.

Trooper West interviewed the defendant by telephone on October 8, 2007. He memorialized that conversation in a police report the following day. The defendant's statements to Trooper West qualify as the admissions of a party, see Fed. R. Evid. 801(d)(2)(A), but the report itself is likely hearsay.[4] According to the report, the defendant "said that on June 28th[, 2007,] Sarah Barton checked the camp and found that a screen had been cut and a window had been broken from the rear of th[e] camp. She went into the camp and discovered that the place had been trashed." When the defendant "heard that his camp was burglarized he did not call the police but rather he and Sarah Barton cleaned and repaired the camp."

The report is silent as to three salient facts: when Barton told the defendant about the break-in, when the clean-up of the cabin took place, and when the defendant became aware that the handgun was missing. The timing of these events is critical to the plaintiff's theory, and the report's silence is amplified by the almost three-month gap between the date of the murder and the date of the telephonic interview.

---

[4] The parties dispute whether the police report falls under the public records exception to the hearsay rule. See Fed. R. Evid. 803(8)(A)(iii). We need not resolve this dispute because, as we explain in the text, the report fails to create a genuine issue of material fact.

To create a genuine issue of material fact, "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989). Although the police report indicates that the defendant was aware when interviewed on October 8, 2007, that the handgun had been stolen, it does not indicate, either directly or by reasonable inference, when the defendant first learned that fact. Thus, the report does not create a conflict with the hard evidence (testimony of the defendant and Barton) that the defendant did not know about the theft of the handgun until after the murders.

To be sure, the defendant apparently told Trooper West that he believed that the break-in occurred at some time between June 22 (when his son left the camp) and June 28 (when Barton went there). But the police report tells us nothing about when the defendant formed that belief. A fortiori, the statement attributed to the defendant by Trooper West tells us nothing about when the defendant learned that the handgun had been purloined. On this uncertain record, the district court did not err in entering summary judgment for the defendant on the failure-to-report claim.

2. **Failure to Secure.** The plaintiff's second substantive argument is that the defendant's failure properly to

secure the handgun created an unreasonable risk of criminal misconduct because of Woodbury's presence in the neighborhood of the camp. While conceding that New Hampshire has not yet found a common-law duty of care in the context of a homeowner's storage of firearms,[5] she nonetheless contends that such a duty exists.

The plaintiff's contention rests heavily on her rendition of the facts. She characterizes Woodbury as a previously convicted felon with a propensity for breaking and entering and asserts that the defendant knew as much. She then points out that Woodbury was intimately familiar with the hunting camp, that he knew the location of the hidden key, that he believed the revolver was his, and that the defendant not only knew these facts but also knew that Woodbury was lurking in the vicinity of the camp. Furthermore, the door to the cabin sometimes failed to lock correctly, the revolver was not kept under lock and key, and the ammunition was left in plain sight.

The plaintiff's version of the facts is in some respects unsupported in the record. In other respects, it depends on unreasonable inferences, adding one plus one to total three. To cite one example, while the record reflects that Woodbury visited the hunting camp several times in his youth, it also makes clear

_____

[5] New Hampshire has imposed statutory restrictions on the storage of firearms around children (up to age 16). See N.H. Rev. Stat. Ann. § 650-C:1. Here, however, the plaintiff's claim is premised exclusively on the common law.

-17-

that Woodbury was not welcome at (and did not go to) the camp after June of 1994 (some thirteen years before the events at issue here). To cite another example, the record is barren of any evidence that the defendant either knew or had reason to believe that Woodbury might be in the vicinity of the hunting camp. According to the record, the defendant knew only that Woodbury, in May of 2007, made an unannounced and uninvited visit to his home in Scarborough, Maine, and that he had been working in Sebago, Maine.[6]

The record, read in the light most favorable to the plaintiff, reflects the following scenario. Some thirteen years before the murders, Woodbury had visited the hunting camp. He knew, at that time, that a key to the cabin was hidden on the premises, and he knew that the defendant kept a handgun inside the cabin. There is no evidence that Woodbury used the concealed key to effect entry into the cabin some thirteen years later, nor is there any evidence that the defendant knew that Woodbury, in the months (or even years) preceding the murders, was anywhere near the camp. Based on this scenario, there is simply no principled basis for holding, under the New Hampshire precedents, that the defendant's unsecured storage of the handgun created "an especial temptation and opportunity for criminal misconduct." Remsburg, 816 A.2d at 1007 (internal quotation marks omitted).

---

[6] Sebago is at least a two-hour drive from Wentworth Location, and Scarborough is at an even greater remove.

Decisions of the New Hampshire Supreme Court compel this conclusion. The court has set a high bar for the special circumstances exception to the general rule that there is no duty to protect others from third-party criminal predations. See, e.g., Dupont, 798 A.2d at 592-93. The court has determined that the special circumstances exception applies only when the risk and foreseeability of criminal misconduct is very great. See, e.g., Remsburg, 816 A.2d at 1007 (explaining that a private investigator's disclosure of personal information to a client creates "an especial temptation and opportunity for criminal misconduct" because harms such as stalking and identity theft are sufficiently foreseeable) (internal quotation marks omitted); Dupont, 798 A.2d at 593-94 (suggesting that liability for an employee's death might arise when supervisors walked co-workers outside so they could continue a heated argument, knew that one of the co-workers had a loaded gun, suspected that the situation might turn violent, failed to notify police, and were aware of a history of employees bringing weapons to work); Iannelli v. Burger King Corp., 761 A.2d 417, 418-21 (N.H. 2000) (holding that restaurant owners could be liable for third party's assault on patrons because management reasonably could have foreseen that a group of "rowdy, obnoxious, loud, [and] abusive" youths claiming to be intoxicated created an unreasonable risk of injury to fellow patrons). Sitting in diversity, we are bound by this body of law; and the record

here, even when construed in the light most flattering to the plaintiff, does not show either a particularized risk of harm or a degree of foreseeability sufficient to animate this exception.

In an effort to shift the debate away from New Hampshire's decisional law, the plaintiff proclaims that the reasoning of some out-of-state decisions supports a different outcome. See, e.g., Jupin v. Kask, 849 N.E.2d 829 (Mass. 2006); Estate of Heck ex rel. Heck v. Stoffer, 786 N.E.2d 265 (Ind. 2003). But a federal court sitting in diversity does not have a roving writ to sift through the decisions of the courts of all fifty states and choose the doctrines that it finds most attractive.

Here, Erie principles require us to apply New Hampshire law, and there is no indication that the New Hampshire Supreme Court would discern a legally cognizable duty based on the circumstances of this case. The plaintiff, who made a deliberate choice to sue in federal court rather than in a New Hampshire state court, is not in a position to ask us to blaze a new trail that the New Hampshire courts have not invited. See Porter v. Nutter, 913 F.2d 37, 40-41 (1st Cir. 1990); Kassel v. Gannett Co., 875 F.2d 935, 949-50 (1st Cir. 1989).

## III.  CONCLUSION

We need go no further. Although we are sensitive to the tragic nature of the events that underpin this case, "it is the duty of all courts of justice to take care, for the general good of

-20-

the community, that hard cases do not make bad law."  <u>United States</u>
v. <u>Clark</u>, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting) (quoting
Lord Campbell in <u>East India Co.</u> v. <u>Paul</u>, 13 Eng. Rep. 811, 821
(P.C. 1849)) (internal quotation marks omitted).  We follow that
admonition here and, for the reasons elucidated above, affirm the
entry of summary judgment in favor of the defendant.

**<u>Affirmed</u>.**